FOUTY, Appellee and Cross–Appellant,

v.

OHIO DEPARTMENT OF YOUTH SERVICES
et al., Appellants and Cross–Appellees.

[Cite as *Fouty v. Ohio Dept. of Youth Servs.*, 167 Ohio App.3d 508, 2006-Ohio-2957.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 05AP–119.

Decided June 13, 2006.

510

512

Martin, Browne, Hull & Harper, P.L.L., and Lauren M. Ross, for appellee.

Jim Petro, Attorney General, and Randall W. Knutti, Assistant Attorney General, for appellants.

PETREE, Judge.

{¶ 1} Defendant-appellant, the state of Ohio, acting through its Department of Youth Services ("DYS") and its Department of Health ("ODH"), appeals from a judgment of the Ohio Court of Claims awarding damages of $374,000 to plaintiff-appellee, Clifton J. Fouty. Plaintiff has filed a cross-appeal, asserting that the trial court erred in denying his request for prejudgment interest.

{¶ 2} In the mid–1980s, plaintiff was hired as a corrections officer in the Ohio Department of Rehabilitation and Correction ("ODRC"). Over the next several years, he was promoted several times within ODRC, eventually achieving the rank of captain. He transferred to DYS in January 2000. On November 1, 2000, he became deputy superintendent of the Circleville Juvenile Correctional Facility. As a deputy superintendent, plaintiff was a member of the unclassified civil service; as such, he was an "at-will" employee.

{¶ 3} On April 2, 2001, plaintiff was notified by DYS labor-relations officer Mary Tipton that he was to submit to a random drug test in accordance with DYS's Drug–Free Workplace Policy. Plaintiff appeared at the designated testing facility and, pursuant to the lab technician's instructions, produced a urine specimen. The specimen was rejected as being above the required temperature range. At the technician's directive, plaintiff produced a second specimen. This sample was rejected as being below the required temperature range. Having been at the testing facility for some time, plaintiff explained that he needed to return to his workplace. The technician told plaintiff that he would report to DYS that the tests were out of range. Plaintiff then left the testing facility and returned to work. Unbeknownst to plaintiff, however, his act of leaving the testing facility was considered a "refusal" to consent to the procedure. Indeed, the lab technician's report indicated that plaintiff "still had time * * * but refused to give another specimen." Consequently, plaintiff's test was deemed positive.

{¶ 4} Two days later, on April 4, 2001, plaintiff received a "Notice of Pre–Disciplinary Hearing Positive Drug and/or Alcohol Test." The notice indicated that plaintiff had tested positive for drugs in violation of DYS Directive B–19, Rule # 18c, "Violation of the Drug–Free Workplace Policy." The predisciplinary hearing was scheduled for April 6, 2001, and was to be conducted by DYS labor-relations officer Bradley Rahr. The hearing began informally, with Rahr permitting plaintiff to explain what had transpired at the testing facility. To that end, plaintiff explained that he did not expressly "refuse" to submit a third specimen; he also voiced his frustration at being charged with a positive test result based upon an unjustified allegation that he had refused to submit to the test.

{¶ 5} Rahr ultimately offered plaintiff the opportunity to enter into a Last Chance Agreement with DYS. That agreement refers to, and incorporates, an ODH Employee Assistance Program ("EAP") Participation Agreement. Rahr told plaintiff that he would recommend that plaintiff's employment be terminated unless he signed both agreements. Faced with the prospect of losing his job, plaintiff acquiesced and executed both agreements on April 11, 2001. Thereafter, Rahr put plaintiff in touch with Debbie Shutt, an intake coordinator for EAP, who would act as plaintiff's case monitor. Shutt advised plaintiff that she would schedule an appointment with clinical psychologist Dr. Charles Gerlach.

{¶ 6} Plaintiff met with Dr. Gerlach for an initial assessment on April 18, 2001. Dr. Gerlach determined that plaintiff did not have a drug problem and opined that the circumstances surrounding the drug tests were probably a "screw-up." Dr. Gerlach then questioned plaintiff about his alcohol consumption. Plaintiff reported that he typically drank two to five beers after work in the evening and occasionally consumed mixed drinks when socializing with friends on the weekend. He further reported that the longest period he had gone without alcohol was 11 days during the 1993 prison siege in Lucasville. He admitted that he had experienced the "shakes" during that time, but attributed his condition to the stress of the situation, not to alcohol withdrawal as suggested by Dr. Gerlach. Plaintiff also reported that his father was an alcoholic.

{¶ 7} Following this discussion, Dr. Gerlach recommended that plaintiff receive intensive outpatient treatment for alcoholism. Plaintiff objected to the treatment recommendation, arguing that he had not been tested for alcohol abuse and did not realize that his alcohol use was at issue. Shutt told plaintiff that he had to follow through with the treatment recommendation in order to comply with the EAP Participation Agreement.

{¶ 8} Aware that Dr. Gerlach did not offer an alcohol treatment program, Shutt, the next day, referred plaintiff to the Pickaway Area Recovery Service ("PARS") for treatment. DYS placed plaintiff on administrative leave pending the results of a return-to-duty drug test. Plaintiff returned to work with no restrictions after the return-to-duty drug test produced negative results.

{¶ 9} On April 25, 2001, Shutt was notified that plaintiff had not yet contacted PARS. After Shutt discussed the matter with plaintiff, he promptly scheduled an appointment with PARS. When he notified Shutt of the appointment, he again expressed his frustration with the situation and indicated that he was considering taking legal action.

{¶ 10} On May 23, 2001, plaintiff met with Greg Adams, a substance-abuse counselor at PARS. Adams conducted an independent assessment and concluded that plaintiff did not have a drug or alcohol problem and did not need any further treatment. Plaintiff immediately relayed the information to Shutt. Shutt re-

sponded that she would contact plaintiff by telephone after she reviewed information sent to her from PARS. Based upon his favorable PARS assessment and his successful completion of other program requirements, plaintiff assumed the matter was resolved.

{¶ 11} Following receipt of the PARS assessment, Shutt contacted Adams to discuss the apparent conflict between his and Dr. Gerlach's assessments. Adams declined Shutt's suggestion that he consult with Dr. Gerlach or anyone else involved in the case and reiterated his position that further treatment was unnecessary.

{¶ 12} Thereafter, Shutt discussed the matter with her supervisor, EAP Clinical Director Ken Kirksey. The two ultimately determined that plaintiff should return to Dr. Gerlach for a second assessment. Concerned about plaintiff's threats of legal action, Kirksey recommended that Shutt communicate the decision to plaintiff in writing.

{¶ 13} Acting on Kirksey's recommendation, Shutt did not telephone plaintiff as she had promised; rather, on May 30, 2001, she mailed a certified letter to plaintiff. The letter, dated May 29, 2001, notes that the PARS assessment directly conflicted with Dr. Gerlach's assessment and further states:

I would remind you that part of your responsibility for maintaining compliance with the Participation Agreement is following through with treatment recommendations made at the time of the assessment. Your options at this point are to contact Dr. Gerlach to schedule another appointment to reassess his recommendations or to have your case closed with EAP. If you do schedule another appointment with Dr. Gerlach and he concurs with your second assessment that treatment is not indicated at this time, we will consider you to be in compliance with your Participation Agreement. If he still believes that treatment is indicated, you will need to follow through with his recommendations in order to maintain compliance.

If you have any questions, please do not hesitate to call me or request to speak to our Clinical Director, Ken Kirksey. I hope to hear from you by [June 4, 2001] so we can discuss your decision.  * * *

{¶ 14} Sometime after the letter was sent, plaintiff noticed a certified mail slip in his mailbox, indicating that he had received a letter from EAP. He did not retrieve the letter, however, because the post office was inconveniently located and he assumed that the letter was a certificate indicating that he had completed the EAP process. The letter was eventually returned to Shutt as unclaimed.

{¶ 15} Shutt sent a second certified letter, dated June 29, 2001, which was identical to the first except that it stated that she hoped to hear from plaintiff by July 9, 2001. The second letter was returned unclaimed on July 17, 2001.

{¶ 16} On July 24, 2001, Shutt notified Rahr that she had received no response to the two certified letters and was ready to close the case as noncompliant. Rahr requested that she send plaintiff a third certified letter; he also suggested that she send the letter via regular mail.

{¶ 17} On July 27, 2001, Shutt sent a third certified letter identical to the first two, except that it stated that she hoped to hear from plaintiff by August 3, 2001. She added, "If we have not heard from you by that time, your case with EAP will be closed as non-compliant." This letter was also sent to plaintiff via regular mail.

{¶ 18} Plaintiff's wife signed for the third certified letter on July 30, 2001; she received the regular mail letter the same day. She did not tell plaintiff about the letters; instead, she put them in the drawer she routinely placed bills in for plaintiff to pay on Saturday mornings after paydays. Plaintiff discovered both letters on Saturday, August 11, 2001, eight days after the August 3, 2001 deadline.

{¶ 19} When plaintiff returned to work on Monday, August 13, 2001, he discussed the matter with Tipton; he did not contact Shutt or anyone else at EAP. Tipton told him not to worry and advised him to contact Sanford Weinberg, then Executive Director for EAP. Acting on Tipton's advice, plaintiff drafted a letter to Weinberg, dated August 16, 2001, explaining the situation and expressing his frustration with the EAP process. Plaintiff sent the letter via regular mail on August 21, 2001.

{¶ 20} In the meantime, on August 13, 2001, Shutt determined to close the case as noncompliant, based upon plaintiff's failure to respond to the third certified letter. Shutt informed plaintiff of the decision in a letter dated August 17, 2001, stating, "We are closing your Participation Agreement with EAP at this time. Requests for you to contact this office have received no response though your certified letter was picked up on [July 30, 2001]. Part of your responsibility throughout the time period of the Participation Agreement is to maintain regular contact with our office and to follow through with treatment recommendations. At this time we have determined that [you] are out of compliance with your Participation Agreement." Shutt sent the letter to plaintiff via regular mail; plaintiff had not received it at the time he sent his letter to Weinberg. Shutt also sent a copy of the letter to Rahr.

{¶ 21} On August 21, 2001, Rahr informed Shutt that he had received her letter of August 17, 2001, and that DYS was proceeding with the termination of plaintiff's employment. The same day, Rahr, via interoffice memorandum, recommended to Mona Reed, DYS Deputy Director of Human Resources, that plaintiff be terminated from employment due to his failure to comply with the EAP Participation Agreement and the DYS Last Chance Agreement.

{¶ 22} On August 27, 2001, plaintiff received written notification from Michael Randle, superintendent of the Circleville Juvenile Correctional Facility, that a predisciplinary hearing was scheduled for August 31, 2001, as a consequence of plaintiff's alleged violation of the Last Chance Agreement. On August 28, 2001, plaintiff was placed on paid administrative leave pending investigation of the alleged violation.

{¶ 23} The same day, Weinberg, in response to plaintiff's August 16, 2001 letter, telephoned plaintiff at home. Weinberg advised plaintiff to contact Shutt and let her know that he was willing to return to Dr. Gerlach to discuss the disparity in treatment recommendations or to begin treatment with PARS.

{¶ 24} Following Weinberg's advice, plaintiff immediately contacted Shutt. He advised her that he had spoken with and written to Weinberg concerning EAP's decision to close his case as noncompliant. Plaintiff informed Shutt of the predisciplinary hearing on August 31, 2001, and asked her what he could do to save his job. Shutt advised plaintiff to return to either Dr. Gerlach or PARS. Plaintiff responded that he would rather go to PARS because he thought Dr. Gerlach was a "quack." Shutt told plaintiff to request an assessment by Melissa Martin, PARS's clinical director.

{¶ 25} Following Shutt's directive, plaintiff contacted PARS on August 28, 2001, and scheduled an appointment with Martin for September 5, 2001. Later that day, plaintiff advised Shutt of the appointment; Shutt discussed the case with Kirksey, and the two agreed that the case should remain closed as noncompliant since plaintiff did not contact EAP after receiving the third certified letter.

{¶ 26} Plaintiff attended the predisciplinary hearing on August 31, 2001. Rahr was scheduled to serve as hearing officer; however, plaintiff objected and Rahr was replaced by labor-relations officer Barry Braverman. Plaintiff recounted the circumstances leading up to the hearing, which, according to plaintiff, included an explanation as to why he did not timely respond to the July 27, 2001 certified letter. Plaintiff also offered a copy of his August 16, 2001 letter to Weinberg and reported that he had scheduled an appointment with PARS. At the conclusion of the hearing, Braverman said that he would review the matter and make a recommendation to Randle within the next few days.

{¶ 27} Following the hearing, Braverman met with Shutt and Kirksey to discuss the matter. Both reported that plaintiff was deemed to be out of compliance with the EAP Participation Agreement because he had failed to respond to the July 27, 2001 certified letter.

{¶ 28} In his recommendation to Randle,[1] Braverman noted that plaintiff spoke on his own behalf, arguing that he had fulfilled the terms of both the DYS Last Chance Agreement and the EAP Participation Agreement. Braverman also noted that plaintiff submitted two documents—Shutt's July 27, 2001 letter and his August 16, 2001 letter to Weinberg. Nonetheless, Braverman averred that plaintiff had presented nothing to refute the allegation that he was not in compliance with the EAP Participation Agreement. Regarding the July 27, 2001 letter, Braverman stated that it "gave clear direction to Mr. Fouty and the consequences should he not follow the options in the letter. Mr. Fouty, from his own discussion, did not follow the options offered to him in the letter."

{¶ 29} On September 4 and 5, 2001, respectively, Randle and then DYS Director Geno Natalucci–Persichetti, signed an order terminating plaintiff's employment, effective September 7, 2001, for violating the Last Chance Agreement. Ernie Moore, a DYS administrator, delivered the order to plaintiff on September 5, 2001.

{¶ 30} Thereafter, plaintiff filed a complaint in the Ohio Court of Claims alleging that DYS breached the Last Chance Agreement by removing him based upon his alleged noncompliance with the EAP Participation Agreement and negligently determined that plaintiff failed to comply with the EAP Participation Agreement. Plaintiff also asserted that ODH negligently determined that he was not in compliance with his EAP Participation Agreement and, through its mishandling of plaintiff's EAP case, induced DYS to breach the Last Chance Agreement. Plaintiff sought damages as well as prejudgment interest.

{¶ 31} The case was tried to the court over two days in August 2004, on the issues of liability and damages. By a decision filed January 4, 2005, the court determined that plaintiff's unclassified, at-will employment relationship with DYS was expressly modified by the Last Chance and EAP Participation Agreements. Having so found, the court resolved that the terms of the two contracts controlled. The court found that the EAP Participation Agreement constituted a contract between plaintiff and ODH. The court further found that the Last Chance Agreement constituted a contract between plaintiff and DYS. Upon examination thereof, the court found the two contracts in conflict, necessitating scrutiny beyond their "four corners" to determine the intent of the parties. Following this analysis, the court concluded that ODH breached its agreement with plaintiff and negligently performed its obligations under that contract. Having so found, the court did not address plaintiff's theory of procurement of breach of contract. The court also found that DYS breached the Last Chance

---

1. The recommendation is dated September 7, 2001; however, Braverman testified that the date was "probably a typo" and that he "probably" wrote it on September 4, 2001.

Agreement and negligently failed to perform its obligations thereunder. The trial court awarded plaintiff $132,275 in past damages and $241,725 in future damages for a total of $374,000. The court denied plaintiff's request for prejudgment interest. The trial court confirmed its decision in a journal entry filed the same day. This appeal followed.

{¶ 32} On appeal, defendant advances the following four assignments of error:

I. The Court of Claims erroneously based its award of $241,725 in future damages on one economist's purely speculative and mathematically incorrect report.

II. The Court of Claims erroneously based its award of $54,772 in past "fringe benefits" on one economist's purely speculative and mathematically incorrect report.

III. The Court of Claims erroneously found the Ohio Department of Health liable for breach of contract even though Mr. Fouty pled no contract claim against the Ohio Department of Health.

IV. The Court of Claims erroneously found the Ohio Department of Youth Services and the Ohio Department of Health liable to Mr. Fouty even though Mr. Fouty proved no breach of any duty by either agency.

{¶ 33} By the first assignment of error, defendant contends that the trial court erred in awarding plaintiff future damages of $241,725. More particularly, defendant maintains that plaintiff failed to prove the existence and amount of future damages with a reasonable degree of certainty.

{¶ 34} "[A] plaintiff is entitled to an award of damages to compensate him for losses which he is reasonably certain to incur in the future." *Galayda v. Lake Hosp. Sys., Inc.* (1994), 71 Ohio St.3d 421, 425, 644 N.E.2d 298. In other words, "The fundamental issue is whether there is reasonable certainty that damage is likely to occur into the future." *Blatnicky v. Sheller–Globe Corp.* (Mar. 28, 1996), Cuyahoga App. No. 69026, 1996 WL 139699 (Karpinski, J., concurring in judgment only). The burden of proving the existence and amount of future damages with a reasonable degree of certainly is on the plaintiff. *Chubb v. Ohio Bur. of Workers' Comp.* (1999), 115 Ohio Misc.2d 1, 10, 760 N.E.2d 473. "Reasonable certainty" has been defined as " 'that degree of certainty of which the nature of the case admits.' " *Bemmes v. Pub. Emps. Retirement Sys.* (1995), 102 Ohio App.3d 782, 789, 658 N.E.2d 31, quoting 22 American Jurisprudence 2d (1988, Supp.1995), Damages, Section 23.

{¶ 35} Plaintiff testified that after he was removed from his position at DYS in September 2001, he initially received unemployment-compensation benefits and engaged in an extensive job search in the corrections, security, and investigative fields. After his unemployment-compensation benefits ended, he worked for a

time as a subcontractor building outdoor advertising billboards. In March 2004, he began working parttime as a satellite-dish installer; he went fulltime in May 2004 and continued in that capacity as of the time of trial. He further testified that he was on a "ready pool waiting list" to become a supervisor with the Transportation Security Administration ("TSA") at the Dayton airport; he averred, however, that he had recently been notified that staff reductions required him to reapply with TSA in order to secure his place in the ready pool. He further testified that he had "pretty much" ended his job search pending outcome of the trial.

{¶ 36} Plaintiff's expert economist, Dr. Jeff Ankrom, prepared a written report estimating plaintiff's damages and testified as to the contents of that report. The report notes plaintiff's age at the time of dismissal, 40.8 years, and a work-life expectancy of 19.64 years. The report sets forth total future lost income (adjusted to present value) of $241,875. Dr. Ankrom testified that he arrived at that figure by subtracting the total amount that plaintiff would earn as a satellite-dish installer from August 11, 2003 (the date of trial), to a projected retirement date of April 29, 2021, from the total amount that plaintiff would have earned as a deputy superintendent at DYS from August 11, 2003, to a projected retirement date of July 21, 2016.[2]

{¶ 37} Dr. Ankrom averred that in preparing his report, he considered plaintiff's educational and employment background, including the fact that plaintiff completed some college coursework and had spent his entire career in the corrections field. He further testified that he based his calculations on the assumption that plaintiff would continue to work as a satellite-dish installer until retirement. He also averred that he did not consider the possibility that plaintiff could find another job in the corrections field. When asked why he did not do so, he stated:

> [W]hat I tried to do is to look at a range of occupational categories, and based on Mr. Fouty's educational experience and his existing work experience, I tried to put him into a wage category that's consistent with those educational attainment levels and experience levels, but my assumption was that he would not be able to easily obtain a deputy superintendent position at this time.

{¶ 38} On cross-examination, Dr. Ankrom admitted that he did not know whether plaintiff planned to continue working as a satellite-dish installer or whether he was searching for other employment. He also averred that he did not calculate plaintiff's future earnings based upon a corrections officer's salary

---

2. Plaintiff testified his calculations include an annual growth rate of one percent and an inflation discount of three percent.

because he assumed that it would be difficult for plaintiff to obtain employment in the corrections field.

{¶ 39} As noted previously, the trial court awarded plaintiff $241,725 in future damages.[3]  In so doing, the court rejected the state's suggestion that plaintiff could have mitigated his future losses by obtaining other employment at a higher rate of pay rather than continuing to work as a satellite-dish installer.  The court stated:

> The court was not persuaded by that argument, nor was Dr. Ankrom.  In light of the negative employment record that defendants established for plaintiff by removing him from his position on the basis of a drug use violation, Dr. Ankrom opined, and this court agrees, that it was highly unlikely that plaintiff could find another state employment position of any kind, much less one of the same rank and pay scale.

{¶ 40} Contrary to the trial court's statement, Dr. Ankrom did not opine that it was "highly unlikely that plaintiff could find another state employment position of any kind, much less one of the same rank and pay scale."  Dr. Ankrom did not opine as to the likelihood of plaintiff's future employment prospects at all.  Indeed, he testified that he did not even consider the matter.  For purposes of his calculations, Dr. Ankrom merely assumed that plaintiff would have difficulty obtaining employment in the corrections field.

{¶ 41} We further note that Dr. Ankrom testified that he based his calculations on the assumption that plaintiff would continue working as a satellite-dish installer until he retired.  However, Dr. Ankrom's assumption is not supported by the evidence.  Dr. Ankrom admitted that he did not know whether plaintiff planned to continue to work as a satellite-dish installer or planned to look for other employment.  Further, plaintiff testified that he had applied for higher-paying employment in the security and corrections fields and had met with some success in that endeavor, having been placed on a ready-pool waiting list to become a supervisor with TSA.

{¶ 42} Finally, we note that the Ohio Supreme Court has expressed some trepidation about awarding front pay to a discharged employee from the date of dismissal (or in this case, the date of trial), until anticipated retirement.  In *Worrell v. Multipress, Inc.* (1989), 45 Ohio St.3d 241, at 246–247, 543 N.E.2d 1277, the court stated:

---

3.  In footnote 5 of its opinion, the trial court noted that the amount awarded ($241,725), which differed from Dr. Ankrom's actual calculation ($241,875), reflected a mathematical correction made upon suggestion of the state's counsel.

[I]t is apparent that front-pay damages are temporary in nature, as they are designed to assist the discharged employee during the transition to new employment of equal or similar status.  * * *

Because front pay is intended to assist the discharged employee to find comparable employment, we agree with those courts that have refused front pay as a matter of right for long-term compensation from the date of discharge until some anticipated retirement date.  Front pay should be awarded for an interim period in circumstances where the discharged employee has employable and productive years ahead.  * * *

{¶ 43} At the time of trial, plaintiff was approximately 43 years old and had completed at least some college coursework.  Although plaintiff may be unable to find comparable state employment, he undoubtedly retains some opportunity to seek and obtain more lucrative employment in the 15 or so years before he retires.  Thus, plaintiff has employable and productive years ahead.  Given these circumstances, as the court instructed in *Worrell,* supra, the trial court should have awarded front pay to plaintiff only for an interim period, i.e., during his transition to new employment of equal or similar status.

{¶ 44} In short, we find that the trial court erred in concluding that plaintiff established his future wage loss with the required degree of certainty.  The first assignment of error is well taken.

{¶ 45} By the second assignment of error, the state contends that the trial court erred in including in plaintiff's back-pay award $23,669 in penalties and taxes that plaintiff incurred when he cashed out his Public Employees Retirement System ("PERS") and Ohio Public Employees Deferred Compensation ("Deferred Comp") accounts and $31,003 in lost fringe benefits.

{¶ 46} "The purpose of a back-pay award is to make the wrongfully terminated employee whole and to place that employee in the position the employee would have been in absent a violation of the employment contract." *State ex rel. Stacy v. Batavia Local School Dist. Bd. of Edn.,* 105 Ohio St.3d 476, 829 N.E.2d 298, 2005-Ohio-2974, at ¶ 26.  That purpose is consistent with the general principle in breach of contract actions, i.e., " 'Money damages awarded in a breach of contract action are designed to place the aggrieved party in the same position it would have been in had the contract not been violated.' "  Id., quoting *Schulke Radio Productions, Ltd. v. Midwestern Broadcasting Co.* (1983), 6 Ohio St.3d 436, 439, 6 OBR 480, 453 N.E.2d 683.

{¶ 47} With regard to the retirement withdrawals, plaintiff testified that after he was removed from his position at DYS, he rolled his PERS account into a private mutual fund retirement plan and then cashed out a portion of those funds;  he also cashed out his Deferred Comp account.  Plaintiff's Exhibit 36

includes documentation supporting that testimony. Dr. Ankrom testified that he utilized those figures in preparing his written report, which depicts in detail the withdrawal penalties and tax liabilities sustained in cashing out the retirement accounts. Those penalties and taxes totaled $23,669 (adjusted to present value).

{¶ 48} The state does not challenge Dr. Ankrom's method of calculation or the mathematical calculations themselves; rather, the state argues that the trial court's award was completely speculative in that no evidence was presented to establish that plaintiff was required to withdraw the retirement funds. In support of its contention, the state notes that plaintiff did not testify that he was required to withdraw the funds and that Dr. Ankrom testified only that he "believe[d] it can be argued that [plaintiff] needed that income to live on, so in that sense, he was required to use [his retirement funds] and sustain that penalty."

{¶ 49} The state does not cite any authority for its proposition that plaintiff was required to expressly state that he had to withdraw his retirement funds. We do not believe that such talismanic language was necessary under the circumstances of this case. Further, we find that Dr. Ankrom's assumption about plaintiff's need to withdraw his retirement funds is supported by the evidence. Plaintiff testified that he withdrew his retirement funds *after* he was terminated from employment. He also testified that at the time he was terminated, he was married, his wife did not work outside the home, and he had four children to support. Plaintiff also testified that he had a difficult time finding comparable employment and ultimately took a job earning approximately half of what he had earned as a state employee. In our view, this evidence clearly supports an inference that plaintiff needed to use his retirement funds to support himself and his family and that but for the termination, plaintiff would not have incurred the penalties and tax liabilities occasioned by the withdrawal of the funds. Therefore, we cannot find that the trial court erred in including the $23,669 in its back-pay award.

██ {¶ 50} Similarly, the court did not err in including $31,003 in lost fringe benefits in its back-pay award. The state appears to challenge Dr. Ankrom's "assumptions" that the cost of plaintiff's fringe benefits was equal to 25.8 percent of the wages plaintiff would have earned had he continued his state employment through the date of trial and that lost fringe benefits are generally recoverable. As to valuation of the fringe benefits, Dr. Ankrom explained his methodology and calculations, and the state thoroughly cross-examined him on both. Further, the state offered no evidence to contradict Dr. Ankrom's testimony as to valuation. As to the contention that plaintiff was required to offer proof that fringe benefits are recoverable, we note that the state has failed to cite any legal authority in support of this argument. We further note that in calculating damage awards,

courts routinely include the fringe benefits that a wrongly discharged plaintiff would have earned. See, e.g., *Chubb,* 115 Ohio Misc.2d at 9, 760 N.E.2d 473. The second assignment of error is not well taken.

{¶ 51} Because the state's third and fourth assignments of error are interrelated, we will address them together. By the third assignment of error, the state contends that the trial court erroneously found ODH liable for breach of contract and/or negligent performance of a contract because ODH had no contract with plaintiff. By the fourth assignment of error, the state contends that the trial court erred in finding DYS and ODH liable for breach of contract and/or negligent performance of a contract.

{¶ 52} The parties do not dispute the trial court's finding that the terms of plaintiff's at-will employment with DYS were expressly altered by the Last Chance and EAP Participation Agreements. See *Mers v. Dispatch Printing Co.* (1985), 19 Ohio St.3d 100, 19 OBR 261, 483 N.E.2d 150. Therefore, the terms of the two contracts control.

{¶ 53} The Last Chance Agreement provides:

[DYS] agrees to * * *:

Hold the removal order to be signed by the Director in abeyance pending successful completion of the EAP Participation agreement, and successful completion of the last chance agreement for the next five (5) year period.

The Employee agrees to * * *:

1) Enter into, sign, and successfully complete an EAP Participation and Last Chance Agreements.

* * *

6) The EAP Participation agreement is designed to monitor the attendance and participation in an approved substance abuse program as determined by the EAP provider. Failure to enter into, and/or successfully complete, and/or sign an EAP Participation Agreement, shall constitute a breach of the Last Chance Agreement and shall result in termination.

It is agreed by all of the parties that if the employee violates the Last Chance Agreement, [t]he EAP Participation Agreement, or if there is continued violation of the Random Drug Testing Policy; the appropriate discipline shall be termination from his/her position. The Department need only prove that the employee violated the above agreement(s)/rule(s) and the SPBR shall have no authority to modify the discipline issued by the Department. All parties acknowledge the waiver of the contractual due process rights to the extent stated above.

This Last Chance Agreement is in force and effect for five (5) years from the date of the employee and employer's signature on this agreement.

{¶ 54} The EAP Participation Agreement states:

The Ohio Department of Youth Services and the employee agree to enter into a contract wherein the employee voluntarily agrees to seek assistance from a Health Care Provider under the Ohio Employee Assistance Program (Ohio E.A.P.), to deal with the problem of Having Tested positive on a Random Drug Test by a refusal To Test.

The employee agrees to participate in a plan for a period of 365 days. Said plan will be developed by the Health Care Provider. The employee agrees to meet all of the requirements set forth in that plan. The employee also agrees to verification as to whether or not the employee is keeping scheduled appointments and is in compliance with the agreed to plan. Said verification will be made by the Case Monitor assigned in accordance with the employee's health plan contract.

A Participation Outline, including the lengths of the various aspects of service and the frequency of appointments or treatment sessions, shall be attached to and made a part of this agreement as soon as possible, but not later than thirty (30) days from the date of signing.

\* \* \*

The employee further agrees to participate in follow-up care as recommended and/or required by the Health Care Provider, and agrees that such follow-up care is to be verified to DYS by the Case Monitor.

DYS agrees that, so long as this contract is complied with in its entirety, the discipline recommended for this employee pursuant to the letter dated for Removal shall be held in abeyance. Should the employee violate this contract, in any part, the recommended disciplinary procedure will be implemented.

\* \* \*

The employee by signing this contract acknowledges that s/he has received a copy of this contract, and has been fully informed of the terms and consequences of it, and hereby voluntarily enters into said contract after having been advised by his/her representative, if applicable.

DYS further agrees that if the employee successfully completes the agreed to plan as certified by the Ohio E.A.P. or its designee, DYS will review the proposed discipline and seriously consider modification of the discipline imposed.

{¶ 55} The trial court concluded that the EAP Participation Agreement constituted a contract between ODH and plaintiff and that ODH both breached and negligently performed the contract. The state contends that the court erred in

so finding on grounds that no contract ever existed between ODH and plaintiff and that plaintiff never pleaded any contract claims against ODH. In support of its argument, the state notes that the only signatories to the EAP Participation Agreement are plaintiff and DYS; no one from ODH signed the agreement.

{¶ 56} While we agree with the state's contention that plaintiff's complaint does not assert a breach-of-contract claim against ODH, we concur in the trial court's finding that the EAP Participation Agreement constituted a contract between plaintiff and ODH. Ohio law acknowledges three types of contracts: express, implied in fact, and implied in law. See *Legros v. Tarr* (1989), 44 Ohio St.3d 1, 6, 540 N.E.2d 257. Unlike express contracts, implied contracts are not created or evidenced by explicit agreement of the parties; rather, they are implied by law as a matter of reason and justice. *B & J Jacobs Co. v. Ohio Air, Inc.,* Hamilton App. No. C–020264, 2003-Ohio-4835, 2003 WL 22103385, at ¶ 9. An implied-in-fact contract arises from the conduct of the parties or circumstances surrounding the transaction that make it clear that the parties have entered into a contractual relationship despite the absence of any formal agreement. Id.

{¶ 57} "To determine the existence of an implied in fact contract, '[t]he conduct and declarations of the party must be examined to determine the existence of an intent to be bound.'" Id., at ¶ 10, quoting *Reali, Giampetro & Scott v. Soc. Natl. Bank* (1999), 133 Ohio App.3d 844, 849–850, 729 N.E.2d 1259. "Because the question of the existence of an implied-in-fact contract requires crucial factual determinations regarding the intent and thought processes of the parties, deference must be paid by a reviewing court to the trial court's determinations." Id. As in all civil cases, "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus.

{¶ 58} Shutt identified the EAP Participation Agreement as an "[EAP] form" and testified that EAP "is part of [ODH]." Rahr testified that although an EAP representative does not typically sign the EAP Participation Agreement, the agreement is "managed by EAP" and is "between the employee and the employer [as well as] the Ohio EAP." He further testified that the EAP Participation Agreement is a standardized form provided by ODH for use by state agencies when referring employees to EAP for assistance in addressing personal problems affecting job performance. According to Rahr, he only "fill[ed] in the blanks" on the agreement with pertinent information regarding plaintiff's particular circumstances.

{¶ 59} Both Rahr and Shutt identified several other standardized ODH forms executed by plaintiff concurrent with the signing of the Last Chance and EAP Participation Agreements. Plaintiff's Exhibit 9 is an "Ohio EAP Participation Agreement Procedure," which sets forth an employee's responsibilities under the agreement. Those responsibilities include contacting EAP on the day the agreement is signed in order to be referred for services, calling the treatment provider to schedule an appointment as directed by EAP, calling the EAP case monitor after attending the first treatment session, and contacting the EAP case monitor at designated times. Plaintiff's Exhibit 10 is an "Ohio Employee Assistance Program Client Confidentiality Policy", which provides, inter alia, that EAP provides only select information about the employee's EAP participation to the employee's agency. Plaintiff's Exhibit 11 is an "Authorization For Release of Information," which authorizes EAP to disclose to the employee's agency certain information about the employee's participation in the EAP. Plaintiff's Exhibit 12 is an "Authorization of Release of Information Among Ohio EAP/UBH/Clinicians State of Ohio," which authorizes United Behavioral Health (which provides reimbursement for state employee health programs) to discuss the employee's treatment history, plan, and progress with the assigned EAP case monitor.

{¶ 60} Rahr further testified that after an employee signs the packet of EAP forms, standard procedure mandates that the employer-agency contact EAP, provide it with the completed packet of EAP forms, and place the employee in touch with EAP. Thereafter, EAP provides the employee with a blank copy of a "Participation Outline," which is to be completed by the treatment provider after the initial meeting with the employee and then mailed or faxed to EAP. Rahr testified that the employer-agency does not receive a copy of the "Participation Outline" and is never apprised by EAP of the specifics of an employee's treatment. According to Rahr, an employee's treatment regimen, and any contact regarding that regimen, is "between [the employee] and [the] EAP." Rahr testified that all determinations as to an employee's compliance or non-compliance with the EAP Agreement are made by EAP. In addition, Shutt identified Plaintiff's Exhibit 17 as her "Continuation Notes," which document her nearly daily contact with plaintiff following his signing of the EAP Participation Agreement.

{¶ 61} Although the trial court did not specify which of the three types of contracts it found the EAP Participation Agreement to be, a review of the record convinces this court that the agreement constituted an implied-in-fact contract between ODH and plaintiff. As the state notes, only plaintiff and Rahr (on behalf of DYS) actually signed the agreement; no one signed on behalf of ODH. However, evidence of the parties' conduct and the circumstances surrounding the transaction establishes that ODH became a party to the agreement through the

tacit understanding of the parties. After plaintiff signed the EAP Participation Agreement, EAP was the sole entity with whom plaintiff had contact regarding his alleged substance-abuse problem. EAP selected plaintiff's initial treatment assessor, Dr. Gerlach, scheduled the initial appointment, and later referred him to PARS. The forms plaintiff signed in conjunction with the EAP Participation Agreement were all standard-issue EAP forms. Finally, EAP was the sole arbiter of whether plaintiff had complied with the EAP Participation Agreement; the three certified letters sent to plaintiff regarding his alleged noncompliance are written on EAP letterhead and are signed by Shutt in her capacity as an EAP case monitor. For these reasons, we find that competent, credible evidence supports the trial court's finding that the EAP Participation Agreement constituted a contract between plaintiff and ODH. The third assignment of error is not well taken.

{¶ 62} The state's fourth assignment of error challenges the trial court's decision finding both DYS and ODH liable for breach of contract and negligent performance of a contract.

{¶ 63} "The construction of written contracts * * * is a matter of law." *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 7 O.O.3d 403, 374 N.E.2d 146, paragraph one of the syllabus. " 'Unlike determinations of fact which are given great deference, questions of law are reviewed by a court *de novo.*' " *Graham v. Drydock Coal Co.* (1996), 76 Ohio St.3d 311, 313, 667 N.E.2d 949, quoting *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm* (1995), 73 Ohio St.3d 107, 108, 652 N.E.2d 684. "The cardinal purpose for judicial examination of any written instrument is to ascertain and give effect to the intent of the parties." *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.* (1997), 78 Ohio St.3d 353, 361, 678 N.E.2d 519, citing *Aultman Hosp. Assn. v. Community Mut. Ins. Co.* (1989), 46 Ohio St.3d 51, 53, 544 N.E.2d 920.

{¶ 64} "[A] writing, or writings executed as part of the same transaction, will be read as a whole, and the intent of each part will be gathered from a consideration of the whole." *Foster Wheeler*, at 361, 678 N.E.2d 519. "Where one instrument incorporates another by reference, both must be read together. * * * Courts should attempt to harmonize provisions and words so that every word is given effect." *Christe v. GMS Mgt. Co., Inc.* (1997), 124 Ohio App.3d 84, 88, 705 N.E.2d 691. Contracts that are, by their terms, clear and unambiguous require no real interpretation or construction, and courts will enforce such contracts as written. *Foster Wheeler*, supra. However, when contracts contain ambiguous or conflicting terms, it is proper for a court to consider extrinsic evidence, i.e., evidence outside the four corners of the contracts, in order to determine the parties' intent. *Shifrin v. Forest City Ents., Inc.* (1992), 64 Ohio St.3d 635, 638, 597 N.E.2d 499. Such extrinsic evidence may include (1) the

circumstances surrounding the parties at the time the contracts were made, (2) the objectives the parties intended to accomplish by entering into the contracts, and (3) any acts by the parties that demonstrate the construction they gave to their agreements. *Blosser v. Carter* (1990), 67 Ohio App.3d 215, 219, 586 N.E.2d 253. As a general rule, contracts should be construed against the drafting party. *Christe,* supra.

{¶ 65} Further, the breach of a duty, even if arising via contract, can constitute a tort, because there is a common-law duty to perform contract obligations with care, skill, reasonable expedience, and faithfulness; negligent failure to do so is both a tort and a breach of contract. *Gabriel v. Allstate Ins. Co.* (Dec. 5, 1979), Clermont App. No. CA 813, 1979 WL 208829, citing *Hunsicker v. Buckeye Union Cas. Co.* (1953), 95 Ohio App. 241, 53 O.O. 185, 118 N.E.2d 922.

{¶ 66} We first address the trial court's decision regarding ODH. Since the Last Chance Agreement incorporates the EAP Participation Agreement by reference, we must read the two documents together to ascertain the intent of the parties. *Foster Wheeler,* 78 Ohio St.3d 353, 678 N.E.2d 519; *Christe,* 124 Ohio App.3d 84, 705 N.E.2d 691. Having examined each in detail, we agree with the trial court that the EAP Participation Agreement includes a provision that conflicts with the terms of the Last Chance Agreement. As noted by the trial court, the Last Chance Agreement plainly states that the removal order that was presented to plaintiff would be held in abeyance pending successful completion of the Last Chance and EAP Participation Agreements. At the end of the document, that language is reiterated: "It is agreed by all of the parties that if the employee violates [the agreements] the appropriate discipline shall be termination." In contrast, the EAP Participation Agreement provides in its conclusion that if plaintiff successfully completed his obligations, DYS would "review the proposed discipline and seriously consider modification of the discipline imposed." We agree with the trial court's assessment regarding the conflicting provisions:

> [I]n short, the Last Chance Agreement is a straightforward, no options, do-this-and-you-will-not-be-fired type of contract; whereas the EAP Agreement provides a loophole: even if plaintiff were to have successfully completed five full years of the agreements, DYS needed only to "seriously consider" whether plaintiff still should be fired, or be subject to some other discipline short of termination such as, perhaps, a demotion, pay-cut, or transfer.

We further agree that the conflicting provisions in the agreements require examination outside their four corners to determine the parties' intent.

{¶ 67} Plaintiff's Exhibit 22, which includes pertinent provisions of the EAP Policies and Procedures Manual, provides that:

The Ohio EAP Participation Agreement was designed to help State of Ohio employees whose job performance deficiencies are, at least in part, due to personal problems. The agreement, which is granted at management's discretion, allows an employee the opportunity to remediate job performance deficiencies which [sic] disciplinary action is held in abeyance. It shall therefore be the goal of all involved parties to have the employee's personal problems resolved and job performance brought to an acceptable standard.

{¶ 68} Plaintiff testified that Weinberg told him during their telephone conversation that EAP's goal is to assist employees with their problems, not to have them removed from their employment. Rahr described EAP's objective as "allowing employees to rehabilitate themselves through the plan. It is not an attempt to restrict them." Similarly, Weinberg described the EAP process as "afford[ing] [an employee] an opportunity to seek rehabilitation."

{¶ 69} As noted by the trial court, the evidence presented at trial fails to demonstrate that plaintiff had any personal problems, drug- or alcohol-related or otherwise, that negatively impacted his job performance. Indeed, the record is replete with evidence that plaintiff was an exemplary employee during his 15–year career. Regardless, DYS offered him the opportunity to participate in EAP as a way to remediate the problem of allegedly testing positive for drugs by refusing to test. Based upon our review of Plaintiff's Exhibit 22 and the testimony of plaintiff, Rahr, and Weinberg, we agree with the trial court that the parties' intention in executing the EAP Participation Agreement was to assist plaintiff with his alleged problem in order to safeguard plaintiff's employment with DYS. To that end, we now consider whether ODH's actions belie that intention, resulting in the negligent performance of the contract.

{¶ 70} The EAP Participation Agreement hinged upon plaintiff's participation in a plan as set forth in a participation outline to be developed by a health care provider. The agreement states that the participation outline, including the lengths of the various aspects of service and the frequency of appointments or treatment sessions "shall be attached to and made a part of [the] agreement as soon as possible, but not later than [30] days from the date of signing." The evidence establishes that no participation outline was ever developed, let alone attached to the agreement, within the specified time period. The participation outline prepared by Dr. Gerlach merely had an "X" next to the preprinted choice of "Intensive Outpatient Treatment." The spaces for "Days of Attendance," "Times of Attendance," "Estimated Number of Days," and "Estimated Discharge Date" were left blank. By handwritten notation, Dr. Gerlach simply indicated that those matters were "to be determined by EAP." Shutt testified that " 'to be determined' refers to making those arrangements to refer [plaintiff] to the appropriate place."

{¶ 71} Following Dr. Gerlach's assessment, Shutt referred plaintiff to PARS for the recommended treatment. Shutt testified that plaintiff attended the PARS assessment as directed. She further testified that no treatment plan was developed by PARS because Adams determined that plaintiff did not need treatment. Accordingly, no participation outline was attached to the EAP Participation Agreement as required.

{¶ 72} Plaintiff reported the results of his PARS assessment to Shutt, who told him she would contact him by telephone regarding the matter. However, as stated previously, Shutt did not telephone plaintiff as promised; instead, she mailed certified letters, two of which she knew plaintiff never received. We agree with the trial court that the duty of care, skill, reasonable expedience, and faithfulness mandated that after 30 days had passed without resolution as to what type of participation, if any, was required of plaintiff, Shutt should have immediately increased her efforts to contact plaintiff.

{¶ 73} Moreover, the EAP Participation Agreement states that it is the case monitor's duty to verify the employee's compliance with the "plan." Shutt testified that her only effort in this regard was through the certified letters because she and Kirksey had determined that since plaintiff had threatened legal action, all communication with him should be in writing. The trial court determined that Shutt did not convincingly explain why she continued to send certified letters even after she realized that the first two letters had been unclaimed. The trial court also found plaintiff's testimony credible as to why he did not retrieve the first two letters from the post office and believed plaintiff's wife's explanation of her actions following receipt of the third letter. It is axiomatic that questions as to the weight of the evidence and the credibility of witnesses are to be determined by the trier of fact. *Horton v. Ohio Dept. of Rehab. & Corr.*, Franklin App. No. 05AP–198, 2005-Ohio-4785, 2005 WL 2210665, at ¶ 15.

{¶ 74} Further, EAP's internal policies and procedures provide that:

AT FIRST INDICATION OF NON–COMPLIANCE WITH TX [TREAT-MENT] PLAN AND/OR WEEKLY CONTACT WITH OHIO EAP CASE MONITOR

Contact employee immediately and establish the need for weekly contact. Explain to the employee why this is important.

If employee fails to follow schedule of checking-in attempt [to] reach him/her by phone calls to both the residence and worksite. After three attempts on alternate days (total of 5 work days), write employee immediately and send Certified Mail/Return Requested.

Contact Union [or] Management Representative for assistance in notifying employee.

If no contact has been established after these efforts, staff case in clinical staff meeting for final disposition.

{¶ 75} Shutt testified that the first indication of plaintiff's alleged noncompliance with the treatment recommendation was his failure to timely respond to the May 29, 2001 certified letter. She admitted, however, that she did not follow EAP procedures, because she made no attempt to telephone plaintiff either at work or at home and made no attempt to contact a management representative for assistance in contacting plaintiff. Shutt defended her failure to follow the procedures by asserting that it was plaintiff's responsibility to maintain contact with EAP. Although plaintiff was required to "keep in touch with the OHIO EAP consulting Intake Coordinator as often as is designated", Shutt admitted that plaintiff was technically under no obligation to maintain contact with her because she had not yet established a contact schedule, because plaintiff had not begun the treatment process. Shutt further admitted that the two times plaintiff was specifically directed to call her (after meeting with Dr. Gerlach and again after he went to PARS), he did so.

{¶ 76} We agree with the trial court's determination that based upon the language of the EAP Participation Agreement and its own internal policies and procedures, ODH negligently performed its agreement with plaintiff "by failing to develop a treatment plan (or to finalize the issue of whether one was needed) and to verify that plaintiff knew what was expected of him and how to comply with such expectations."

{¶ 77} Similarly, we agree with the trial court's determination that DYS failed to perform its obligations under the Last Chance Agreement with care, skill, reasonable expedience, and faithfulness when it unquestioningly accepted ODH's determination that plaintiff was out of compliance with the EAP Participation Agreement. As noted, the parties' objective in referring plaintiff to EAP was to preserve plaintiff's standing and position in the department; therefore, DYS clearly had a duty under the Last Chance Agreement and the common law to carefully examine EAP's findings in assessing whether termination was warranted. The evidence establishes that DYS was fully aware of EAP's concerns about plaintiff's participation in the EAP process, yet did nothing to advise plaintiff that he needed to modify his actions. Certainly DYS could have formulated some method of communicating EAP's concerns to plaintiff without breaching EAP confidentiality. Further, the documentary and testimonial evidence relating to the August 31, 2001 predisciplinary hearing establishes that DYS did not seriously consider plaintiff's explanation of the circumstances. Indeed, Braverman's report states that "[t]here was nothing presented to refute the allegations."

{¶ 78} Finally, we concur in the trial court's interpretation of the final paragraph of the Last Chance Agreement as requiring DYS to prove that plaintiff violated the Last Chance and EAP Participation Agreements before taking action against him, as well as its determination that DYS did not prove a violation. As noted, it appears that DYS did not consider plaintiff's account of the events leading up to the predisciplinary hearing. To the contrary, DYS merely accepted without question ODH's determination that plaintiff was out of compliance with the EAP Participation Agreement. It thus appears that the predisciplinary hearing was nothing more than a perfunctory step in the removal process. Therefore, we agree with the trial court that DYS could not avoid liability by deferring to ODH's determination. Having determined that ODH and DYS are both liable under plaintiff's claims for negligent performance of the contract, we need not address the trial court's failure to consider plaintiff's claim that ODH induced DYS to breach the Last Chance Agreement. The fourth assignment of error is not well taken.

{¶ 79} Having concluded that the trial court properly determined that the state, acting through its agents DYS and ODH, negligently performed the Last Chance and EAP Participation Agreements and that plaintiff was entitled to past damages resulting from those actions, we next address plaintiff's cross-assignment of error, which states as follows:

The Court of Claims erred in not awarding prejudgment interest to Plaintiff.

{¶ 80} Plaintiff asserts that the trial court erred in failing to grant his request for prejudgment interest on the back-pay award.[4] The award of prejudgment interest in this case is governed by R.C. 2743.18(A) and 1343.03(A). R.C. 2743.18(A)(1) provides that "[p]rejudgment interest shall be allowed with respect to a civil action on which a judgment or determination is rendered against the state for the same period of time and at the same rate as allowed between private parties to a suit." R.C. 2743.18(A)(2) provides that "[t]he court of claims, in its discretion, may deny prejudgment interest for any period of undue delay between the commencement of the civil action and the entry of a judgment or determination against the state, for which it finds the claimant to have been responsible."

{¶ 81} Former R.C. 1343.03(A) provided the applicable rate of interest as follows:

[W]hen money becomes due and payable upon any * * * contract or other transaction, the creditor is entitled to interest at the rate of ten per cent per annum, and no more, unless a written contract provides a different rate of

---

4. Plaintiff also contends that the trial court erred in failing to award him prejudgment interest on the award of future damages. However, we have already determined that plaintiff failed to establish his future wage loss with the required degree of certainty.

interest in relation to the money that becomes due and payable, in which case the creditor is entitled to interest at the rate provided in that contract.

{¶ 82} R.C. 1343.03 was amended on June 2, 2004. R.C. 1343.03(A) now provides that:

[W]hen money becomes due and payable upon any * * * contract or other transaction, the creditor is entitled to interest at the rate per annum determined pursuant to section 5703.47 of the Revised Code, unless a written contract provides a different rate of interest in relation to the money that becomes due and payable, in which case the creditor is entitled to interest at the rate provided in that contract.[5]

{¶ 83} R.C. 5703.47(B) states:

On the fifteenth day of October of each year, the tax commissioner shall determine the federal short-term rate. For purposes of any section of the Revised Code requiring interest to be computed at the rate per annum required by this section, the rate determined by the commissioner under this section, rounded to the nearest whole number per cent, plus three per cent, shall be the interest rate per annum used in making the computation for interest that accrues during the following calendar year.

{¶ 84} Plaintiff cites in support of his argument the Ohio Supreme Court's decision in *Royal Elec. Constr. Corp. v. Ohio State Univ.* (1995), 73 Ohio St.3d 110, 652 N.E.2d 687. In that case, Royal Electric contracted with the state to provide electrical renovations on two separate projects. Due to delays and disruptions occasioned by the state, Royal Electric's work on the projects was not substantially completed until after the originally scheduled completion dates. As a result of the delays, Royal Electric sued the state for breach of contract. The Court of Claims awarded damages and prejudgment interest.

{¶ 85} On appeal, the Ohio Supreme Court considered the issue of prejudgment interest. Noting that R.C. 2743.18(A) utilizes the word "shall," the court determined that "if a judgment or determination is rendered by the court against the state, the decision to allow or not allow prejudgment interest is not discretionary. The only matter that is discretionary with the court is the determination of 'undue delay.'" *Royal Elec.*, 73 Ohio St.3d at 115, 652 N.E.2d 687. The court

---

5. The notes regarding the current version of R.C. 1343.03 state as follows: "The interest rate provided for in division (A) of section 1343.03 of the Revised Code, as amended by this act, applies to actions pending on the effective date of this act. In the calculation of interest due under section 1343.03 of the Revised Code, in actions pending on the effective date of this act, the interest rate provided for in section 1343.03 of the Revised Code prior to the amendment of that section by this act shall apply up to the effective date of this act, and the interest rate provided for in section 1343.03 of the Revised Code as amended by this act shall apply on and after that effective date."

further determined that "in computing the amount of interest owed, the court is required to look to R.C. 1343.03(A) to determine *when* interest commences to run, *i.e.*, when the claim becomes 'due and payable,' and to determine *what* legal rate of interest should be applied." (Emphasis sic.) Id.

{¶ 86} The court concluded that Royal Electric was entitled to prejudgment interest from the date Royal Electric substantially completed the projects.

> [T]he trial court determined that Royal had substantially completed the [first] project by March 12, 1989 and the [second] project by September 1, 1991, and that the damages sustained by Royal as a result of the delays and other problems associated with the projects accrued (became "due and payable") at the time that Royal had substantially completed each of the projects. In this regard, the trial court held that interest awarded on the damages involving [the projects] commenced on March 12, 1989 and September 1, 1991, respectively.

Id. at 117–118, 652 N.E.2d 687.

{¶ 87} The syllabus of *Royal Elec.* states:

> In a case involving breach of contract where liability is determined and damages are awarded against the state, the aggrieved party is entitled to prejudgment interest on the amount of damages found due by the Court of Claims. The award of prejudgment interest is compensation to the plaintiff for the period of time between the accrual of the claim and judgment, regardless of whether the judgment is based on a claim which was liquidated or unliquidated and even if the sum due was not capable of ascertainment until determined by the court. (R.C. 2743.18(A) and 1343.03(A), construed and applied.)

{¶ 88} In the instant case, the trial court cited both *Royal Elec.* and its own decision in *Chubb,* which construed *Royal Elec.* As in the instant case, the plaintiff in *Chubb* was an unclassified civil servant who successfully claimed that her termination from state employment constituted a breach of contract. Following a separate damages hearing, the court awarded back pay but declined to award prejudgment interest, stating that "the *Royal Electric* case is distinguishable since the total award to plaintiff in that case could easily be fixed in time, by the date of 'substantial completion' of the work. In this case, plaintiff's award continued to grow on a daily basis up to the day of trial." *Chubb,* 115 Ohio Misc.2d at 10, 760 N.E.2d 473.

{¶ 89} The trial court's reliance on *Chubb* is misplaced, because *Chubb* inappropriately narrows the holding in *Royal Elec. Royal Elec.* clearly holds that R.C. 2743.18(A) and 1343.03(A) mandate an award of prejudgment interest on a successful contract action against the state. Thus, pursuant to *Royal Elec.,* plaintiff is entitled to an award of prejudgment interest "for the period of time

between accrual of the claim and judgment" and the trial court erred in denying plaintiff's request for prejudgment interest.

{¶ 90} Accordingly, the case must be remanded to the trial court for a determination of when the interest commenced to run, i.e., when plaintiff's claim accrued, and what legal rate of interest should be applied to the award of back pay. In addition, pursuant to R.C. 2743.18(A)(2), the court, in its discretion, may deny prejudgment interest for any period of "undue delay" between the commencement of plaintiff's action and the entry of judgment for which the court finds plaintiff to have been responsible. On remand, the trial court should consider the state's claim that prejudgment interest should not be awarded on the lost-benefits and retirement-withdrawal portions of the back-pay award. Plaintiff's cross-assignment of error is well taken.

{¶ 91} For the foregoing reasons, the state's first assignment of error is sustained, and its second, third, and fourth assignments of error are overruled. Plaintiff's cross-assignment of error is sustained. Accordingly, the judgment of the Ohio Court of Claims is affirmed in part and reversed in part, and this cause is remanded to that court with instructions.

Judgment affirmed in part
and reversed in part,
and cause remanded.

FRENCH and TRAVIS, JJ., concur.