[Cite as *AO Freight Corp. v. Snyder Computer Sys., Inc.*, 2010-Ohio-4778.]

STATE OF OHIO, JEFFERSON COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| AO FREIGHT CORP., | ) | |
| | ) | CASE NO. 09 JE 7 |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| - VS - | ) | OPINION |
| | ) | |
| SNYDER COMPUTER SYSTEMS, INC.) | | |
| WILDFIRE MOTORS, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |


CHARACTER OF PROCEEDINGS:    Civil Appeal from County Court No. 1,
                             Case No. 2008 CVF 208.


JUDGMENT:                    Affirmed.


APPEARANCES:
For Plaintiff-Appellee:      No Brief Filed


For Defendant-Appellant:     Attorney Robert J. D'Anniballe, Jr.
                             100 North Fourth Street,
                             Sinclair Building, 10th Floor
                             Steubenville, OH  43952


JUDGES:
Hon. Mary DeGenaro
Hon. Joseph J. Vukovich
Hon. Gene Donofrio


                             Dated:  September 24, 2010

DeGenaro, J.

{¶1}    This timely appeal comes for consideration upon the record in the trial court and Appellant's brief.  Appellant, Snyder Computer Systems, Inc., dba Wildfire Motors ("Wildfire") appeals the February 17, 2009 decision of the Jefferson County Court No. 1 that found an implied contract existed between Wildfire and Appellee, AO Freight Corporation ("AO Freight"), and awarded AO Freight $1,571.00 for shipping services.

{¶2}    Wildfire argues that the trial court erroneously found that AO Freight and Wildfire had formed a contract for shipping goods because AO Freight provided no proof that Wildfire had purchased goods from the seller (Nanjing Tianneng Fenglifadianji Chan ("NTFC"), not a party to this action), and provided no proof that Wildfire had solicited AO Freight's services in connection with the goods.

{¶3}    Wildfire's email communications with AO Freight, as well as its acceptance of the delivered goods, affirmatively indicated that it accepted AO Freight's offer to coordinate and provide shipping services.  The trial court's decision that an implied contract had been formed was not against the manifest weight of the evidence, and the trial court's decision is affirmed.

### Facts and Procedural History

{¶4}    On June 12, 2008, AO Freight filed its complaint in the Jefferson County Court No. 1, alleging that Wildfire owed AO Freight $1,728.50 plus interest for freight, terminal, and handling charges for a July 12, 2007 shipment, and storage charges for a July 9, 2007 shipment.  Both shipments transported goods from NTFC in Nanjing, China. In Wildfire's July 14, 2008 answer, it alleged that it had not ordered goods from NTFC, had informed NTFC of the same prior to the shipment of the goods, and thus should not be obligated to pay AO Freight for the shipping charges for the goods.

{¶5}    In its responses to Plaintiff's First Request for Admissions, Wildfire denied, among other things, that it had ordered services from AO Freight, that it had failed to object to services provided by AO Freight until occurrence of suit, and that it had benefitted from any services provided by AO Freight. In its response to Plaintiff's Second

Request for Admissions, Wildfire admitted that two deliveries of goods were made to Wildfire through AO Freight on July 9, 2007 and July 12, 2007, that Wildfire accepted the deliveries and took possession of the goods, and that Ken Adams, an authorized representative or employee of Wildfire, acknowledged receipt of both deliveries.

{¶6} On December 15, 2008, AO Freight filed a Motion for Summary Judgment, noting that under Ohio law, a consignee (a buyer or recipient of shipped goods) is not obligated to accept shipments of goods not ordered, but if consignee accepts and takes possession of the shipment, it is liable for the shipping charges. AO Freight argued that, because Wildfire accepted the July 12, 2007 shipment through AO Freight, Wildfire became liable for the shipping charges as a matter of law. AO Freight also noted that Wildfire's relationship with NTFC does not affect Wildfire's obligations to compensate AO Freight for services rendered.

{¶7} On December 23, 2008, after receiving leave from the trial court, Wildfire filed a Counterclaim alleging that AO Freight should pay $3,400.00 in storage charges as a result of wrongfully shipping the goods to Wildfire. On January 2, 2009, Wildfire filed a Response to Plaintiff's Motion for Summary Judgment, and attached an affidavit of Don Snyder, CEO of Wildfire, denying that any shipping charges were owed. Snyder attested that AO Freight contacted him to request advance payment for a shipment of goods, Snyder advised AO Freight not to ship said goods because they had not been ordered, and AO Freight conducted the shipment despite Snyder's protest.

{¶8} On February 12, 2009, the trial court took the parties' various filings under consideration and held a hearing on the merits of AO Freight's complaint. AO Freight presented the testimony of Ken Lu, station manager of the Chicago office of AO Freight. Wildfire presented the testimony of Alan Tipton, general manager of Wildfire.

{¶9} Lu testified that AO Freight is an International Air Transportation Association agent, which means it is a broker (also known as a freight forwarder) between a consignee (buyer) or shipper (seller) and the carriers. In order to ship goods internationally, a freight forwarder needs a commercial invoice, a packing list, and air waybills. This information can come from either the seller or the buyer.

{¶10} For the first shipment between NTFC and Wildfire that AO Freight facilitated, Wildfire was to pay for duties and all charges up to the package's arrival in Chicago, after which point NTFC was responsible for domestic shipping charges. Wildfire paid AO Freight $2,888.00 for shipping before the goods arrived in the United States, but AO Freight incurred the $157.50 storage fee after the goods arrived. The storage charges were due to a delay in customs processing, caused either by Wildfire's customs broker, Renee DiDonato, or by the customs office itself.

{¶11} Lu testified that the parties continued their original email correspondence and began to discuss a second shipment. For the second shipment, Lu received air waybills and manifest from Cherry Li, an agent with Realogistic's, NTFC's freight forwarder in China, and later received better copies of the same documents from Wildfire, as Li's were badly scanned. In the email exchange, which included Lu, Li, Pam Grim (import manager at Wildfire) and Tipton, Li expressed that the agreement was for Wildfire to pay for shipping charges. Grim responded by forwarding Li's email to Lu and referencing the second shipment. Lu testified that he provided all necessary documents to DiDonato, and that an employee from Wildfire twice called Lu to push him to hurry the customs clearance process.

{¶12} Lu testified that during the July 6 through July 11 correspondences between the parties, no one from Wildfire informed him that AO Freight was not to make the second shipment. After the second shipment was completed and accepted on July 12, 2007, AO Freight attempted to collect payment, and spoke with DiDonato, who said that payment for shipping should be paid by the buyer, Wildfire. Lu contacted Wildfire directly and spoke with Grim a few times, but was otherwise ignored. After further inquiry by Lu, Wildfire sent an email to AO Freight on July 25, 2007 stating that they never authorized AO Freight to make that second shipment, and that AO Freight should seek payment from NTFC.

{¶13} On cross examination, Lu stated that Realogistics, rather than Wildfire, initiated the request for AO Freight to facilitate the second shipment. However, Lu talked to Wildfire by phone before executing the second shipment arrangements, and requested the commercial invoice and packing list. Lu's email to Grim on July 6, 2007 was after the

second shipment had already been arranged with Wildfire, and was to notify her that it would arrive in Chicago that day.

**{¶14}** Lu testified that the July 9 delivery was the first transaction that AO Freight had with Wildfire, and that they had no ongoing contractual agreement for services. Lu explained that freight forwarders do not receive information on the contractual arrangement between sellers and buyers regarding the goods requiring shipment. Lu only had contact with Realogistics and Wildfire, and did not have any agreement or communications with NTFC. Lu stated that AO Freight had required payment prior to delivery for the first shipment because they had not dealt with Wildfire before, and normally always require advance payment, but did not impose such requirements for the second shipment in order to foster a long-term business relationship with Wildfire, and because payment for the first shipment had gone smoothly. Lu further said that he did not demand payment prior to delivery of the second shipment because he wanted to avoid storage charges from any delays, and Wildfire pushed him to complete the delivery quickly.

**{¶15}** Tipton testified that he is the general manager of Wildfire Motors. He testified that the two shipments discussed are the only transactions that Wildfire has had with AO Freight. Tipton noted that on July 6, 2007, Li sent an email at 8:06 a.m. to Lu, Grim and Tipton regarding a second shipment to Don Snyder. Attached to the email were air waybills and a manifest for a second shipment, with Snyder listed as the buyer at Wildfire's address. Tipton noted that Grim's email to Lu at 10:09 a.m. on July 6, which read "Dear Ken, Please find attached all documents for second shipment," merely included a forwarded copy of Li's email with the same documents.

**{¶16}** Tipton stated that Wildfire did not hire AO Freight to do anything, and that all of AO Freight's documentation came from China, not from Wildfire. Tipton stated that Wildfire did not have any business relationship with Li of Realogistics. Wildfire has a different freight forwarder that it regularly uses. Tipton stated that when Wildfire imports items, it does so through Cleveland or Pittsburgh, and would never have set up a shipment through Chicago. Tipton stated that he was not involved with the transaction at issue until problems arose at the Wildfire office from receiving repeated calls from Lu.

Tipton received all of the emails previously discussed, but did not act on any of them because Grim was working on the situation.

{¶17} On cross-examination, Tipton stated that he did not get involved with the AO Freight issue until a few weeks after the July 6, 2007 correspondence. Tipton said he received and read the emails around July 6 through 11, but did not do anything about them, because he had personally overheard Snyder telling AO Freight on the phone that he had never ordered the goods being shipped. He finally responded to AO Freight's emails around July 26 because he "got sick of it." Tipton stated that he did not know who Li was, and did not know how she had obtained his email address. Tipton did not know why Grim proceeded to correspond with AO Freight about the second order, though he guessed it was because she did not know about the situation. Tipton did not tell Grim that Wildfire had not ordered the second shipment, and did not know if anyone else had told Grim that the order had not been placed.

{¶18} On redirect, Tipton noted that an email from Lu on July 24, 2007 only asked for $610.00 in payment for the second shipment, which Tipton supposed meant that Lu was trying to recoup a partial payment due to Lu's mistake. The court then questioned Tipton about the background of the first shipment. Tipton stated AO Freight called Wildfire to inform it that a shipment was coming, Wildfire protested the amount but paid it to avoid further storage costs, and moreover, the first shipment was damaged. Both shipments are currently in a warehouse in Wildfire's possession, opened in order to identify the contents, but otherwise unused.

{¶19} Lu testified on rebuttal that the reason he had asked for $610.00 on July 24, 2007 was because Grim had demanded a price of $500, and he charged that amount with additional terminal fees. Lu also said that he expected Grim to pay the $610.00 amount first and pay the remainder of the originally invoiced price later. On cross-examination, Lu clarified that he did not agree to a reduced rate of $610.00 but had requested at least that amount as an initial payment.

{¶20} In closing, Wildfire maintained it had no contractual obligations to AO Freight, that there was a verbal denial by Snyder, and since Wildfire knew from the first shipment that AO Freight would not ship without payment, Wildfire did not think anything

would be shipped. AO Freight maintained that it received no oral or other denials of the second shipment, Grim's emails indicated that Wildfire was expecting the second shipping order, and Wildfire accepted the shipment when it easily could have refused the second shipment.

**{¶21}** The trial court held that AO Freight was entitled to $1,571.00 for charges associated with the July 12, 2007 shipment, and that AO Freight had not proven that it was entitled to $157.50 for storage charges for the July 9, 2007 shipment. The trial court found that AO Freight had proven, by a preponderance of the evidence, that Wildfire had ordered the second shipment. The trial court noted that Wildfire was listed as the buyer on the documents it received, and that Wildfire did not deny its buyer status or the second order at all, despite its active communications with AO Freight, until approximately two weeks after accepting and taking possession of the second shipment. The trial court found that Wildfire offered no competent proof to rebut the implied contract, and suspiciously failed to have Grim testify.

**{¶22}** As AO Freight did not file an appellee brief, we may consider Wildfire's statement of the facts and issues as correct and reverse the judgment if Wildfire's brief reasonably appears to sustain such action. App.R. 18(C).

### Contract Formation – Implied Contract

**{¶23}** In its sole assignment of error, Wildfire asserts:

**{¶24}** "The trial court erred in finding that AO Freight is entitled to the sum of $1,571.00 for shipping charges as there was no implied contract between the parties."

**{¶25}** Although a reviewing court must interpret the terms of an established contract as a matter of law, the determination of whether a contract exists between parties involves questions of fact. *Oglebay Norton Co. v. Armco, Inc.* (1990), 52 Ohio St.3d 232, 235, 556 N.E.2d 515. And a trial court's decision on a question of fact that is supported by some competent, credible evidence going to all the material elements of the case must not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 280, 8 O.O.3d 261, 376 N.E.2d 578. Further, a reviewing court should make all reasonable presumptions in favor

of the trial court's judgment and findings of fact. *Karches v. City of Cincinnati* (1988), 38 Ohio St.3d 12, 19, 526 N.E.2d 1350.

**{¶26}** To prevail on a contract action, the complaining party must prove all of the essential elements of a contract, including an offer, acceptance, the manifestation of mutual assent, and consideration. *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, at ¶16. "In express contracts the assent to its terms is actually expressed in offer and acceptance. In contract implied in fact the meeting of the minds * * * is shown by the surrounding circumstances which made it inferable that the contract exists as a matter of tacit understanding." *Legros v. Tarr* (1989), 44 Ohio St.3d 1, 6-7, 540 N.E.2d 257, quoting *Hummel v. Hummel* (1938), 133 Ohio St. 520, 525, 11 O.O. 221, 14 N.E.2d 923. Whether a party manifests an intention to be bound is a question of fact to be resolved by the trier of fact. *Oglebay Norton Co.*, supra. The issue in this case is the existence of an implied contract.

**{¶27}** In order to determine whether an implied in fact contract was formed, the finder of fact must determine whether an intent to be bound can be rightfully inferred from the conduct and statements of the parties. *Fouty v. Ohio Dept. of Youth Servs.*, 167 Ohio App.3d 508, 2006-Ohio-2957, 855 N.E.2d 909, at ¶57. "The most obvious example of the use of the implied contract concept occurs where a recovery is sought for services rendered or materials furnished and the circumstances are such that people expect to be paid and pay for such conduct. The law is said to 'imply' an obligation on the part of a person who benefits from the services or materials received to pay for the services or materials. *Ashley v. Henahan* (1897), 56 Ohio St. 559, 574, 47 N.E. 573, 577. However, the plaintiff must prove that the defendant either requested or assented to such conduct under conditions precluding an inference that the plaintiff acted gratuitously." *Cuyahoga Cty. Hospitals v. Price* (1989), 64 Ohio App.3d 410, 416, 581 N.E.2d 1125, quoting *Lucas v. Costantini* (1983), 12 Ohio App.3d 367, 369, 13 OBR 449, 469 N.E.2d 927.

**{¶28}** In order to determine whether an implied contract has been formed, it could be helpful to consider the parties' interactions chronologically. *Cohen v. G/C Contracting Corp.*, 2d Dist. No. 2006 CA 102, 2007-Ohio-4888, at ¶38, citing Corbin on Contracts,

Vol. I, §2.1.   Here, the pertinent chronological facts presented in the documentary evidence are as follows:

{¶29}  On June 22, 2007, AO Freight sent a fax to Wildfire indicating that the first shipment was on its way from China to Chicago, billing Wildfire $2,888.00 for shipping, and indicating that Wildfire would further be responsible for duty charges and NTFC would cover any additional U.S. shipping charges.  On the same day, Wildfire sent a fax to AO Freight, providing contact information for DiDonato, Wildfire's customs broker, and Grim, its import manager.  The first shipment arrived in Chicago on June 26, 2007, and went into storage pending customs clearance.

{¶30}  A Master Air Waybill for the second shipment was executed on July 2, 2007. A House Air Waybill for the second shipment was executed on July 3, 2007, naming NTFC as seller and Snyder at Wildfire as buyer, with payment terms as "freight collect."

{¶31}  At some point on or before July 6, Wildfire wired payment to AO Freight for the first shipment and the shipment cleared customs.  The first shipment began transit from Chicago to Steubenville on July 6.

{¶32}  On the morning of July 6, 2009, Li sent an email with Air Waybill attachments to Lu, Tipton and Grim, indicating that the second shipment was arriving from China to Chicago, that Wildfire is to pay for the shipping costs, that the freight costs were $1,461.00, and that AO Freight should charge an additional $202.67 if Wildfire does not do its own customs clearance.

{¶33}  Later in the morning of July 6, Grim forwarded the above email with attachments to Lu and Tipton, stating "Please find attached all documents for second shipment."  A few hours later, Lu replied to Grim and Tipton, referencing the import document, indicating that the shipment would arrive in Chicago that day, billing Wildfire $1,571.00, instructing Grim to have DiDonato clear customs before July 10, and asking Grim if she would make the bank wire for payment.  The AO Freight invoice for the second shipment included $1,461.00 for freight charges, and $110.00 for terminal and handling charges.

{¶34}  On July 7, Lu emailed Li, Grim and Tipton, noting that Li needed to provide

NTFC's commercial invoice and packing list to give to DiDonato or else customs clearance for the second shipment would be delayed. On July 8, Li responded to Lu, Grim and Tipton, attaching the invoice and packing list, and noting that Wildfire could provide such documentation to avoid customs delays. On July 9, 2007, the first shipment arrived in Steubenville, and Adams signed the carrier's delivery receipt.

{¶35} On July 10, 2007, Grim replied to Li's July 8 email, and copied Lu and Tipton, stating "The charges on the freight are outrageous. We believe the charges should only be $500.00." A domestic Uniform Straight Bill of Lading was executed on July 10, 2007, and the second shipment began transit from Chicago to Steubenville on July 11. On July 11, Grim re-sent her July 10 email, noting that it was her second request. Li then replied to Grim, Lu and Tipton, stating that the freight charge could not be lowered. On July 12, the second shipment arrived in Steubenville, and Adams signed the carrier's delivery receipt.

{¶36} On July 24, 2007, Lu emailed Grim, Li and Tipton, complaining that Wildfire had not yet paid for the second shipment, noting that AO Freight had done a favor by tendering delivery prior to receiving payment, and demanding immediate payment of $610.00. On July 25, Tipton replied to Lu, stating "We gave no authorization for this product to ship threw [sic] your company. Therefore, please contact the shipper for payment."

{¶37} The exhibits presented at trial indicate that AO Freight was notified of a second order between Wildfire and NTFC, and that Wildfire would pay for the shipment of the goods. When Grim received the correspondence regarding the second shipment, instead of communicating a denial, she responded "please find attached all documents for second shipment." Most importantly, Wildfire conceded that when the second shipment arrived, Wildfire accepted the goods, and upon acceptance of those goods, it gave no indication of denial or rescission until approximately two weeks later. This amounts to some competent, credible evidence supporting the trial court's finding that Wildfire assented to the contract and that Wildfire became bound to compensate AO Freight for its services.

{¶38} Wildfire asserts that there was no proof of contract formation between

Wildfire and AO Freight because AO Freight provided no proof that Wildfire had ordered the goods from NTFC. However, a contract for the carriage of goods does not require proof of a contract for the sale of the goods in order to be legally valid. Wildfire's contractual relationship with NTFC is outside the scope of the question as to whether Wildfire manifested the intent to be bound to pay for AO Freight's services. Even if AO Freight's initial understanding of Wildfire's shipping order had been due to misrepresentations by NTFC, the evidence showed that Wildfire had knowledge that AO Freight was under the impression that a valid order existed, and Wildfire's communications affirmed and reinforced that impression.

{¶39} Wildfire also asserts that there was no proof of contract formation between Wildfire and AO Freight because AO Freight provided no proof that Wildfire had sought out and engaged the services of AO Freight for shipment brokerage services. However, as noted above, even if a party does not initially request the services of another, he may still be bound if he assents to the provision of those services. *Cuyahoga Cty. Hospitals.*, supra. Wildfire's communications with AO Freight, affirmative references to documents which signified Wildfire as the buyer for a freight-collect shipping arrangement, as well as accepting the delivery of the goods, all indicate that Wildfire assented to the provision of AO Freight's services.

{¶40} Because the trial court's finding of an implied-in-fact contract was supported by competent credible evidence, the decision of the trial court was not against the manifest weight of the evidence. Wildfire's sole assignment of error is therefore meritless, and the judgment of the trial court is affirmed.

Vukovich, P.J., concurs.

Donofrio, J., concurs.