NEXUS COMMUNICATIONS, INC., Appellant,

v.

QWEST COMMUNICATIONS CORPORATION, Appellee.

[Cite as *Nexus Communications, Inc. v. Qwest Communications Corp.*, 193 Ohio App.3d 599, 2011-Ohio-1759.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 10AP–561.

Decided April 12, 2011.

600

James R. Leickly, for appellant.

Carlile, Patchen & Murphy, L.L.P, and H. Ritchey Hollenbaugh; Wheeler Trigg O'Donnell, L.L.P, and Edward C. Stewart, pro hac vice, for appellee.

BRYANT, Presiding Judge.

{¶ 1} Plaintiff-appellant, Nexus Communications, Inc., appeals from a judgment of the Franklin County Court of Common Pleas denying its motion for summary judgment and granting the summary-judgment motion of defendant-appellee, Qwest Communications Corporation. Because (1) genuine issues of material fact remain concerning defendant's motion for summary judgment, but (2) no genuine issue of material fact remains regarding plaintiff's motion for summary judgment, we affirm in part and reverse in part.

## I. Facts and Procedural History

### A. The Written Contract

{¶ 2} On March 17, 2006, plaintiff and defendant entered into a written contract, the "Qwest Total Advantage Agreement" ("QTAA"), in which plaintiff

agreed to purchase from defendant certain telecommunications services, including inbound domestic toll-free calling services. Plaintiff negotiated substantially discounted rates from defendant's nondiscounted base rates for the services and, in exchange, provided defendant with a one-year term and use commitment of $2,500 per month.

{¶ 3} Pursuant to Sections 3.2 and 3.3 of an exhibit to the QTAA, plaintiff was to be charged the discounted rate of $.022 per minute for domestic interstate inbound toll-free calls. Section 3.2 specifically provided that "[t]he Net Rates listed below * * * already include all applicable discounts, including the QTA[A] Discount. Unless otherwise stated in this Service Exhibit, the Net Rates set forth herein are in lieu of any rates listed in the Service Schedule." Section 2 of the QTAA listed the "QTA[A] Discount" as 22 percent.

{¶ 4} Section 2 of the QTAA also listed the initial term of the agreement as one year and provided that at the conclusion of the one-year term, the agreement would automatically renew for consecutive one-year terms if not terminated earlier in accordance with the QTAA's termination provisions. The termination provisions, set forth in Section 9, provided that either party could terminate the agreement by submitting written notice to the other party at least 60 days prior to the expiration of the then current term.

{¶ 5} When plaintiff executed the QTAA on March 17, 2006, it attached a termination letter postdated January 15, 2007, 61 days before the one-year initial term expired. The letter, which plaintiff's president Steven Fenker signed, specifically stated that it served "as the notice to terminate the *Qwest Total Advantage Agreement* that was entered into by our respective companies on 3/17/06." Citing the portions of the QTAA addressing termination, the letter stated that "[i]t is the express intent of Nexus Communications, Inc., to terminate the above referenced agreement prior to the end of the original term, and any then current renewal terms."

B. Negotiations for Month–to–Month Services

{¶ 6} On January 12, 2007, Fenker e-mailed Dustin Reiner, defendant's account manager, reiterating plaintiff's intention to terminate the QTAA at the expiration of the one-year term and not allow it to roll into a renewal term. Fenker proposed that the parties negotiate competitive per-minute rates. On March 14, 2007, defendant's lead paralegal, Roxanne Wilson, e-mailed Fenker requesting clarification of plaintiff's intent regarding both the QTAA and the potential for providing ongoing services after the QTAA expired.

{¶ 7} To that end, Wilson inquired whether Nexus intended "to terminate the [QTAA], leaving the services installed on a month-to-month basis at month-to-month rates until otherwise terminated by Nexus" or rather "to terminate all

services in addition to the termination of the [QTAA] with such termination effective March 17, 2007." Fenker responded via e-mail the same day, stating, "Nexus' intent is to leave the services installed on a month-to-month basis until Nexus can reach terms with Qwest that are acceptable to sign a new agreement." Fenker advised that "[i]f Nexus and Qwest cannot negotiate new terms with a new agreement, then Nexus will, at that time, provide Qwest with a written request to terminate all services. Nexus is ready willing and able to negotiate new terms on a successor agreement."

{¶ 8} Reiner replied via e-mail on March 15, 2007, with proposed rates for a new agreement and confirmed that defendant's month-to-month rates would go into effect after the QTAA expired. Reiner pointed out to plaintiff that "the letter of disconnect for the QTA[A] contract and associated term and volume discounts will have a major impact on your rates beginning Sunday, March 18th." As Reiner explained, plaintiff would "go to base rates on the services provided. Service itself will not be impacted."

{¶ 9} Plaintiff rejected the rates that defendant proposed in the March 15, 2007 e-mail. The parties continued negotiations but ultimately were unable to reach terms on a successor long-term contract prior to expiration of the QTAA. After expiration of the QTAA, defendant continued to provide telecommunications services on a month-to-month basis, and plaintiff continued to use those telecom- munications services. Defendant invoiced plaintiff monthly for the services provided after March 17, 2007, at a rate of $.044 per minute. Plaintiff remitted payments of $26,436.28 and $46,932.12 in May and June 2007, respectively, reflecting a per-minute rate of $.0268 based on modification of the QTAA rates.

{¶ 10} On August 14, 2007, Debbie Lynch, defendant's billing representative, notified Fenker via e-mail that plaintiff owed over $100,000, and payment in full was expected by close of business on August 17, 2007, to avoid interruption in services. On the same day, Fenker e-mailed Lynch seeking "some basis for why [defendant] doubled the rates back in mid-March. Simply stating 'market based rates' does not suffice. I need you to show me where these rates are referenced in a tariff, in the contract or otherwise." On August 16, 2007, Lynch responded to Fenker, informing him that the requested information could be found on defendant's website.

{¶ 11} By e-mail dated August 17, 2007, Fenker again sought clarification from Lynch regarding the term "base rate," explaining he saw "nothing whatsoever in any document that you have presented that grants Qwest the authority to arbitrarily change the rates of the agreement." Observing that "[n]owhere does the effective rate of $0.044 MOU appear," Fenker asked if she could "direct [him] to any document or any contract term that references the $0.044 MOU rate." The same day, Fenker sent defendant a check for $13,321 in purported full

satisfaction of the amount plaintiff owed defendant. Defendant received the check on August 20, 2007.

## C. The Litigation

{¶ 12} On August 22, 2007, plaintiff filed a complaint against defendant, alleging that defendant had breached the QTAA by "arbitrarily and without notice doubling the effective rate of the inbound toll-free service to approximately $0.40 cents a minute." Defendant subsequently cashed the $13,231 check that plaintiff had tendered as full payment of its debt, but on November 20, 2007, tendered repayment of $13,231 to plaintiff in care of plaintiff's counsel of record in the lawsuit. Defendant terminated its telecommunications services to plaintiff on November 30, 2007, due to nonpayment.

{¶ 13} On December 10, 2007, defendant followed its initial answer and counterclaim with an amended answer and counterclaim, asserting that it had "notified plaintiff prior to the end of the Agreement term that [its] standard base rate of $0.04 (four cents) would apply effective March 18, 2007 if the parties did not agree on terms for a new contract prior to that date." Defendant alleged that plaintiff "expressly stated it wished to continue service on a month-to-month basis, and expressly and/or impliedly agreed to pay for services as invoiced by [defendant]." Defendant's counterclaim contended that plaintiff had "breached its agreement to pay the applicable month-to-month rates following the expiration of the parties' initial Agreement." Defendant alternatively asserted counter-claims for quantum meruit, unjust enrichment, and promissory estoppel.

{¶ 14} On December 24, 2007, plaintiff filed a reply to defendant's counter-claim, asserting, among other defenses, accord and satisfaction. On the same day, plaintiff filed a motion for summary judgment, claiming that an accord and satisfaction discharged any obligation it had on the outstanding invoices. Defen-dant responded, arguing that it had properly tendered repayment of plaintiff's check within 90 days and, in any event, plaintiff did not tender its purported accord-and-satisfaction check in good faith.

{¶ 15} Defendant filed its own motion for summary judgment on June 24, 2008, asserting that plaintiff's breach-of-contract claim failed as a matter of law because plaintiff affirmatively terminated the contract entitling plaintiff to the discounted $0.022 per minute rate upon which plaintiff based its breach-of-contract claim. Defendant's motion also asserted that it was entitled to summary judgment on its breach-of-contract counterclaim. Defendant contended that the parties' e-mail correspondence regarding the provision of services on a month-to-month basis after March 17, 2007, constituted an enforceable contract that plaintiff breached by refusing to pay the agreed-upon rates. Defendant argued, alternatively, that if no valid or enforceable contract existed between the parties after March 17,

2007, it was entitled to summary judgment on its equitable counterclaims for quantum meruit, unjust enrichment, and promissory estoppel.

{¶ 16} The trial court filed a decision and entry on July 29, 2008, denying plaintiff's motion for summary judgment on the accord-and-satisfaction issue. The trial court concluded that even if plaintiff had tendered the check in good faith, defendant successfully avoided the accord and satisfaction when it tendered full repayment to plaintiff within the statutorily authorized 90–day period.

{¶ 17} The court, however, granted defendant's summary-judgment motion directed to plaintiff's claim for breach of contract. The court concluded that "plaintiff's termination notice does not even remotely suggest that it expected to continue the contract at all, even on modified terms, much less continue it on a month-to-month basis." Because no language in the written contract supported plaintiff's claim that its terms applied after the QTAA was terminated, the court determined that plaintiff's breach-of-contract claim failed as a matter of law.

{¶ 18} The trial court also granted defendant summary judgment on its breach-of-contract claim against plaintiff. The court pointed to defendant's March 15, 2007 responsive e-mail notifying plaintiff that it would be charged the base rate for continued services if no new agreement were reached. The court observed that plaintiff admitted it had received defendant's notice, did not object to defendant's invoicing plaintiff at the undiscounted base rate, used defendant's services on a month-to-month basis while negotiating a new agreement, and never provided defendant with written notice to terminate those month-to-month services.

{¶ 19} Although the trial court acknowledged defendant's failure to present affirmative evidence of a meeting of the minds on the essential terms of a month-to-month contract, the court concluded that the evidence supported a meeting of the minds. The court pointed not only to plaintiff's request that defendant continue providing services on a month-to-month basis at the base rate but also to plaintiff's acknowledgment in writing that it understood the meaning of the term "base rate." Noting that plaintiff never told defendant to stop providing services, the court concluded that the parties' actions formed a contract implied in fact. The court accordingly concluded that plaintiff owed defendant for services it used, payable at the base rate, from March 18, 2007, until November 30, 2007, when defendant disconnected plaintiff's services for nonpayment. With that premise, the court entered judgment for "defendant and against plaintiff in the amount of $107,387.38 plus interest at the rate of 1% per month (12% per annum) for any amount not paid within 30 days of November 30, 2007, until this judgment is satisfied."

## II. Assignments of Error

{¶ 20} Plaintiff assigns three errors on appeal:

ASSIGNMENT OF ERROR NO. 1

The trial court erred in granting Qwest summary judgment on Qwest's counterclaim and against all of Nexus['] claims set forth in the Complaint because the contract, drafted by Qwest, states a base rate to be charged Nexus that is far less than the rate that was charged by Qwest.

ASSIGNMENT OF ERROR NO. 2

The trial court erred in granting Qwest summary judgment on Qwest's counterclaim and against all of Nexus['] claims set forth in the Complaint because Nexus had put on the record evidence of Qwest's breach of contract.

ASSIGNMENT OF ERROR NO. 3

The trial court erroneously and needlessly overruled the Colorado legislature and erred in denying the Nexus motion for summary judgment because there was undisputed evidence of an accord and satisfaction based on the plain language of the Colorado statute.

{¶ 21} Plaintiff's three assignments of error challenge the trial court's disposition of the parties' competing summary-judgment motions. An appellate court reviews summary judgment under a de novo standard. *Coventry Twp. v. Ecker* (1995), 101 Ohio App.3d 38, 41, 654 N.E.2d 1327; *Koos v. Cent. Ohio Cellular, Inc.* (1994), 94 Ohio App.3d 579, 588, 641 N.E.2d 265. Summary judgment is appropriate only when the moving party demonstrates that (1) no genuine issue of material fact exists, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds could come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence most strongly construed in its favor. Civ.R. 56(C); *State ex rel. Grady v. State Emp. Relations Bd.* (1997), 78 Ohio St.3d 181, 183, 677 N.E.2d 343.

## III. First Assignment of Error—Base Rate

{¶ 22} Plaintiff's first assignment of error contends that the trial court erred in granting defendant's motion for summary judgment on plaintiff's breach-of-contract claim and on defendant's counterclaim for breach of contract. Plaintiff maintains that the trial court erroneously determined the per-minute rate to be charged for month-to-month services after expiration of the QTAA was calculated using the base rates set forth in the services schedule published on defendant's website rather than the base rates set forth in the QTAA.

A. Plaintiff's Breach–of–Contract Claim

{¶ 23} The trial court concluded that plaintiff's breach-of-contract claim failed as a matter of law because plaintiff itself terminated the contract that it used to support its claim.

{¶ 24} Plaintiff notified defendant that it would terminate the QTAA when the one-year term ending March 16, 2007, expired. It also stated that from the point of termination, it would proceed on a month-to-month basis until either the parties could reach a new agreement or plaintiff provided defendant with written notification terminating the month-to-month services. In response, defendant advised plaintiff that upon expiration of the QTAA, plaintiff would be charged for ongoing services at the base rate applicable to month-to-month services.

{¶ 25} In determining the applicable base rate, the trial court examined the QTAA for pertinent definitions and provisions. The trial court noted that the QTAA defined base rate as the rate described in the services schedule, the QTAA provided that the services schedule could be found on defendant's website, and based on the evidence submitted with the motions, plaintiff read and understood the services schedule. The trial court determined that because plaintiff was notified that it would be charged the base rate following expiration of the QTAA and plaintiff failed to object to that base rate, plaintiff impliedly agreed to pay for defendant's services at that base rate.

{¶ 26} Plaintiff contends that although the trial court properly looked to the QTAA to determine the applicable base rate, the trial court wrongly determined that the services schedule trumped the provisions of the QTAA itself. To support its argument, plaintiff points to Section 2(d) of the QTAA, which provides that "[i]n the event of a conflict in any term of any documents that govern" defendant's providing service under the terms of the QTAA, "the following order of precedence will apply in descending order of control: Tariff, Service Exhibit, Agreement, Services Schedule, and any Order Form." Plaintiff argues that the QTAA language confirms that its provisions not only have priority over the services schedule but establishes that the base rate to be charged for the month-to-month services should be calculated by deducting the 22 percent discount from the QTAA contractual rate of $.022 per minute, resulting in a rate of $.0268 per minute.

{¶ 27} Contrary to plaintiff's contentions, the QTAA rate and any variant of it contained in the QTAA did not apply after March 17, 2007. Nothing in the QTAA permits or even suggests that the QTAA rate continued on a month-to-month basis after it was terminated. Moreover, plaintiff's January 15, 2007 letter unequivocally asserted that plaintiff intended to terminate the QTAA at the conclusion of the one-year term ending March 16, 2007. The letter did not

suggest that plaintiff expected to continue the contract, even with modified terms, on a month-to-month basis. Plaintiff's e-mail correspondence with defendant, including plaintiff's January 12, 2007 e-mail that reiterated its intention to terminate the QTAA after March 16, 2007, similarly stated that plaintiff intended to terminate the QTAA.

{¶ 28} Consistent with his messages to defendant, Fenker admitted that after March 17, 2007, defendant began providing services on a month-to-month basis. Although Fenker initially asserted that plaintiff did not terminate the QTAA but simply notified defendant of its intent not to automatically renew, he admitted that the January 15, 2007 letter stated that it was a termination letter, served as written notice to terminate the QTAA pursuant to Section 9, and did not employ the term "autorenew."

{¶ 29} Because plaintiff terminated the QTAA following expiration of the initial one-year term, the QTAA had no legal effect after March 16, 2007. Plaintiff's breach-of-contract claim fails as a matter of law, and the trial court did not err in so concluding.

## B.   Defendant's Breach–of–Contract Claim

{¶ 30} The trial court determined that the parties' conduct immediately prior to and following expiration of the QTAA established a contract implied in fact that plaintiff breached when it failed to pay the base rate of $.044 per minute from the time the QTAA expired until defendant disconnected plaintiff for nonpayment.

{¶ 31} The elements of a contract include offer, acceptance, contractual capacity, and consideration—also referred to as the bargained-for legal benefit or detriment—as well as manifestation of mutual assent and legality of object and consideration. *Lake Land Emp. Group of Akron, L.L.C. v. Columber*, 101 Ohio St.3d 242, 2004-Ohio-786, 804 N.E.2d 27, ¶ 14, citing *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, ¶ 16. To establish breach of contract, defendant must demonstrate (1) the existence of a contract, whether express or implied, (2) defendant's performance, (3) plaintiff's breach, and (4) defendant's damage or loss. *Gruger v. Diversified Air Sys., Inc.*, 7th Dist. No. 07 MA 52, 2008-Ohio-3403, 2008 WL 2633470, ¶ 42, citing *Doner v. Snapp* (1994), 98 Ohio App.3d 597, 600, 649 N.E.2d 42.

{¶ 32} The issue on appeal turns on whether the parties created a contract after plaintiff terminated the QTAA. Courts generally determine the existence of a contract as a matter of law. *Motorists Mut. Ins. Co. v. Columbus Fin., Inc.*, 168 Ohio App.3d 691, 2006-Ohio-5090, 861 N.E.2d 605, ¶ 7, citing *Zelina v. Hillyer*, 165 Ohio App.3d 255, 2005-Ohio-5803, 846 N.E.2d 68, ¶ 12. Appellate review of questions of law regarding the existence of a contract is de

novo. *Motorists Mut.* at ¶ 7, citing *Continential W. Condominium Unit Owners Assn. v. Howard E. Ferguson, Inc.* (1996), 74 Ohio St.3d 501, 502, 660 N.E.2d 431.

{¶ 33} Ohio law recognizes three types of contracts: express, implied in fact, and implied in law. *Fouty v. Ohio Dept. of Youth Servs.*, 167 Ohio App.3d 508, 2006-Ohio-2957, 855 N.E.2d 909, ¶ 56, citing *Legros v. Tarr* (1989), 44 Ohio St.3d 1, 6, 540 N.E.2d 257. "While both express and implied contracts require the showing of an agreement based on a meeting of the minds and mutual assent, the manner in which these requirements are proven varies depending upon the nature of the contract." *Reali, Giampetro & Scott v. Soc. Natl. Bank* (1999), 133 Ohio App.3d 844, 849, 729 N.E.2d 1259.

{¶ 34} In an express contract, assent to the contract's terms is formally expressed in the parties' offer and acceptance. Id., citing *Legros*. "Unlike express contracts, implied contracts are not created or evidenced by explicit agreement of the parties; rather, they are implied by law as a matter of reason and justice." *Fouty* at ¶ 56, citing *B & J Jacobs Co. v. Ohio Air, Inc.*, 1st Dist. No. C–020264, 2003-Ohio-4835, 2003 WL 22103385, ¶ 9. "An implied-in-fact contract arises from the conduct of the parties or circumstances surrounding the transaction that make it clear that the parties have entered into a contractual relationship despite the absence of any formal agreement." Id. " 'In contracts implied in fact the meeting of the minds, manifested in express contracts by offer and acceptance, is shown by the surrounding circumstances which make it inferable that the contract exists as a matter of tacit understanding.' " *Waffen v. Summers*, 6th Dist. No. OT–08–034, 2009-Ohio-2940, 2009 WL 1741731, ¶ 31, quoting *Hummel v. Hummel* (1938), 133 Ohio St. 520, 525, 14 N.E.2d 923.

{¶ 35} After plaintiff notified defendant that it intended to terminate the QTAA when the QTAA's one-year initial term expired, defendant, two days before the QTAA expired, offered through e-mail to continue providing services to plaintiff "on a month-to-month basis at month-to-month rates until otherwise terminated by [plaintiff]." Plaintiff, through a responsive e-mail, stated that it would accept defendant's services on a month-to-month basis until it could reach terms with defendant on a new agreement. One day before the QTAA expired, defendant confirmed its month-to-month rates would become effective following expiration of the QTAA and specifically advised plaintiff that it would be charged base rates on the services provided.

{¶ 36} After March 17, 2007, defendant undisputedly invoiced plaintiff for the month-to-month services provided at the rate of $.044 per minute. Although plaintiff remitted payment on the invoices, it did so in May and June 2007 at the rate of $.0268, derived from the QTAA rate. Plaintiff asserted in its e-mail to defendant that the documentation defendant provided neither allowed defendant

to arbitrarily increase the rates set forth in the QTAA nor referred to the $.044 per minute rate.

{¶ 37} During his deposition, Fenker admitted that defendant notified him before the QTAA expired that defendant would charge plaintiff at a higher rate, the base rate for month-to-month services, but did not state what those rates would be. He further acknowledged that he was aware that the QTAA defined base rate as the rate described in the services schedule, he stated that he had read and understood the services schedule, and he did not remember seeing a definition of base rate on the services schedule. Fenker stated that he believed that the QTAA was the primary source for rate information.

{¶ 38} In her affidavit submitted with defendant's motion for summary judgment, Wilson stated that absent a written contract with a customer for discounted rates, the published rates set forth the services schedule, available on defendant's website, and govern defendant's rates for domestic toll-free services, including on a month-to-month basis. According to Wilson, those rates are $.08 per minute for toll-free dedicated services and $.10 per minute for toll-free switched services. Wilson averred that defendant could have charged plaintiff those rates following expiration of the QTAA, but when plaintiff notified defendant that plaintiff intended to move to month-to-month terms and conditions, defendant determined that it would charge plaintiff at the $.044–per–minute rate.

{¶ 39} Implied contracts require a meeting of the minds and mutual assent. *Reali.* Here, genuine issues of material fact remain regarding the rate per minute to be charged for the month-to-month services, creating genuine issues of material fact about whether the parties had a meeting of the minds on an essential term of the contract. Although both parties acknowledge that defendant would charge plaintiff the base rate for the month-to-month services provided after the QTAA terminated, the parties embraced different concepts of the "base rate." When defendant's notion of "base rate," reflected in the invoices defendant submitted to plaintiff for the month-to-month services, did not comport with plaintiff's notion of "base rate," Fenker immediately disputed the $.044–per–minute rate and remitted payment at the base rate he claims was in effect, $.0268 per minute, insisting nothing defendant presented to plaintiff referred to the $.044–per–minute rate that defendant ultimately charged plaintiff.

{¶ 40} Because genuine issues of material fact remain about the parties' impliedly contracting for the provision of telecommunications services on a month-to-month basis following expiration of the QTAA, the trial court erred in concluding that defendant was entitled to judgment as a matter of law on its counterclaim for breach of contract. Should remand determine, either through bench or jury trial, that the parties had no meeting of the minds and therefore no

implied contract after March 16, 2007, then defendant's equitable claims must be considered and resolved.

{¶ 41} At oral argument on appeal, defendant asserted that under an implied-in-fact contract arising after the QTAA terminated on March 16, 2007, the term "base rate," as defined in either the QTAA or on defendant's website, did not control after defendant provided the first month of services. Rather, after the first month, defendant contended that it was free to charge plaintiff whatever rate it wished to charge until plaintiff provided defendant with a written request to terminate defendant's services. Defendant, however, did not so argue before the trial court or in its appellate brief and thus forfeited the argument, at least for purposes of this appeal. *Maust v. Meyers Prods., Inc.* (1989), 64 Ohio App.3d 310, 313, 581 N.E.2d 589. On remand, with the trial court's accession, defendant may raise the issue.

{¶ 42} Plaintiff's first assignment of error is sustained in part and overruled in part.

## IV. Second Assignment of Error—Defendant's Quality of Service

{¶ 43} Plaintiff's second assignment of error asserts that the trial court erred in granting summary judgment to defendant because the trial court ignored plaintiff's evidence that defendant breached the QTAA "in the areas of services, billing and phantom fees." In particular, plaintiff asserts that defendant breached the QTAA not only by billing for services after plaintiff "ported away" its toll-free number to another carrier on June 20, 2007, but also by providing substandard service.

{¶ 44} To support its claim of improper billing, plaintiff relies on Fenker's affidavit testimony submitted with plaintiff's memorandum in opposition to defendant's summary-judgment motion. In his affidavit, Fenker averred that defendant billed plaintiff for services after plaintiff "ported away" its number to another carrier on June 20, 2007. Plaintiff explained its contentions with a photocopy of a "Letter of Agency" ("LOA") from plaintiff to McLeodUSA Telecommunications Services, Inc., that Fenker executed on May 8, 2007, authorizing McLeod to manage and administer plaintiff's toll-free number. Apparently conceding that it had agreed to provide defendant with written notice of termination of services, plaintiff asserted that McLeod's providing the LOA to defendant, coupled with plaintiff's "porting away" its number from defendant, constituted de facto written notice to defendant to terminate the month-to-month services. Plaintiff thus asserted that defendant knew about the transfer and should not have been charging for services after that date. The court rejected plaintiff's argument, concluding that plaintiff had not been erroneously billed for services after it transferred its toll-free number to McLeod, because plaintiff had

never requested, in writing, that defendant terminate the month-to-month services.

{¶ 45} To support its claim of substandard service, plaintiff again relies on Fenker's affidavit with attached e-mail correspondence between the parties from September and October 2006 and February, March, and April 2007, which referred to failures and problems with defendant's network. The trial court, however, stated that it would not entertain any argument pertaining to the quality of services that defendant provided because plaintiff did not allege it in its complaint or in its summary-judgment motion.

{¶ 46} The trial court properly concluded that plaintiff failed to present evidence that it provided defendant the written request to terminate services as its March 14, 2007 e-mail contemplated. Nor did the evidence it submitted with its summary-judgment motion indicate that McLeod ever provided the LOA to defendant. Although the trial court properly granted summary judgment on plaintiff's argument concerning termination of services, plaintiff also asserted in its response to defendant's summary-judgment motion that defendant provided substandard service; plaintiff supported its argument with an affidavit from Fenker. The trial court did not address the issue and on remand must consider it.

{¶ 47} Plaintiff's second assignment of error is overruled in part and sustained in part.

## V. Third Assignment of Error—Accord and Satisfaction

{¶ 48} Plaintiff's third assignment of error asserts that the trial court erred in denying its motion for summary judgment based on accord and satisfaction.

{¶ 49} Although the parties' briefs allude to, but do not resolve, whether to apply Colorado or Ohio law in this matter, we need not decide the issue, because the pertinent provisions of the Colorado and Ohio accord-and-satisfaction statutes are virtually identical. Both Colorado and Ohio have statutes modeled after Uniform Commercial Code Section 3–311 ("U.C.C."); both generally permit a debtor who complies with certain requirements to tender a check to a creditor for less than the amount claimed in full satisfaction of a disputed and unliquidated claim. See U.C.C. Section 3–311(a); Colo.Rev.Stat. 4–3–311(a); R.C. 1303.40. Under the provisions, "the claim is discharged if the person against whom the claim is asserted proves that the instrument or an accompanying written communication contained a conspicuous statement to the effect that the instrument was tendered as full satisfaction of the claim." U.C.C. Section 3–311(b); Colo.Rev. Stat. 4–3–311(b); R.C. 1303.40(A). One provision, relevant here, allows a claimant to tender repayment of an alleged full satisfaction check "to the person against whom the claim is asserted" within "ninety days after payment of the

instrument." U.C.C. Section 3–311(c)(2); Colo.Rev.Stat. 4–3–311(c)(2); R.C. 1303.40(B)(2).

{¶ 50} On August 17, 2007, plaintiff sent defendant a check for $13,321 in purported full satisfaction of the amount owed defendant. Plaintiff wrote "full and final payment" in the memorandum line and included accord-and-satisfaction language on the back. Plaintiff sent the check from its place of business located at 3629 Cleveland Avenue in Columbus to defendant's corporate office in Dublin, Ohio. Defendant received the check on August 20, 2007; the check was posted at defendant's lockbox express address in Louisville, Kentucky on August 29, 2007. On November 20, 2007, defendant tendered repayment of $13,231 to plaintiff in care of plaintiff's counsel of record in the lawsuit at counsel's address in Rocky River, Ohio.

{¶ 51} Plaintiff moved for summary judgment, claiming that an accord and satisfaction discharged any obligation it had on defendant's outstanding invoices. Plaintiff argued that defendant cashed the $13,231 check and did not "retender[ ] [it] to the legal person of Plaintiff, Nexus Communications, the entity which issued it." Plaintiff supported its motion with Fenker's affidavit stating, "Qwest has not re-tendered to Nexus by mail, delivery or in person at its only business of 3629 Cleveland Ave., Suite C, Columbus, Ohio 43224 any check, or any check in the amount of $13,231.00 (Thirteen Thousand Two Hundred Thirty One Dollars)."

{¶ 52} In its memorandum opposing plaintiff's summary-judgment motion, defendant maintained that it inadvertently accepted plaintiff's check and so properly tendered repayment in accordance with its statutory rights. Defendant additionally argued that plaintiff did not tender its purported accord-and-satisfaction check in good faith. Defendant supported its arguments with the affidavit of Annette Edwards, a credit and collections manager in defendant's business-market group, who averred that although plaintiff's check was received and posted on August 29, 2007, at defendant's lockbox express address in Louisville, Kentucky, defendant did not knowingly or intentionally accept the check as full and final payment of plaintiff's debt. Defendant also submitted the affidavit of Sylvia Winningham, an accounts-payable manager, who stated that defendant sent a repayment check in the amount of $13,231 to plaintiff via United Parcel Service ("UPS") on November 19, 2007. Winningham said UPS tracking information confirmed that the repayment check was delivered on November 20, 2007, to plaintiff's attorney's office in Rocky River, Ohio.

{¶ 53} Plaintiff, in response, noted Fenker's affidavit, in which he stated both that the office of plaintiff's attorney in Rocky River was not a business address for plaintiff and that plaintiff's attorney did not have implied or express authority to accept payments on plaintiff's behalf. With that premise, plaintiff argued that because the tender of repayment to its counsel does not constitute a tender "to

the person against whom the claim is asserted," the exception to an accord and satisfaction did not apply, and the claimed debt therefore is discharged.

{¶ 54} The trial court determined that genuine issues of material fact remained as to whether plaintiff's tender of $13,231 in purported satisfaction of a $100,000–plus debt met the statutory definition of good faith and whether the amount of the claim was subject to a bona fide dispute, given the absence of a provision in the QTAA permitting plaintiff to pay the contracted lower rate while renegotiating the contract that it had unequivocally cancelled. The trial court, however, concluded that even if plaintiff had tendered the check in good faith, defendant successfully avoided the accord and satisfaction when it tendered repayment within the statutorily prescribed 90–day time limit. The court thus concluded that tender of repayment to a represented party's counsel of record satisfied the statutory requirement for tender of repayment to the person against whom the claim is asserted.

{¶ 55} Although plaintiff on appeal appears to dispute the calculation of the 90 days, plaintiff in the trial court disputed only the person to whom the repayment was tendered. Plaintiff suggests that it raised the issue before the trial court through Fenker's affidavit, stating that defendant "failed to re-tender payment to any person at Nexus within 90 days." Plaintiff's argument is unpersuasive, since both its argument in the trial court as well as Fenker's affidavit in support were limited to whether repayment was tendered to the appropriate person. Plaintiff thus forfeited the issue that it attempts to argue on appeal. *Maust.*

{¶ 56} As the trial court noted, neither the Ohio nor Colorado accord-and-satisfaction statutes define the phrase, "the person against whom the claim is asserted." The trial court attempted to harmonize the language in the accord-and-satisfaction statute with Ohio Prof.Cond.R. 4.2, which prohibits a lawyer from "communicat[ing] about the subject of the representation with a person the lawyer *knows* to be represented by another lawyer." (Emphasis sic.) The court determined that plaintiff's argument ignored "the usage of trade in the legal profession that communication between represented parties is conducted almost entirely through counsel." The court held that defendant's tender of repayment to plaintiff's counsel rather than to plaintiff directly permitted defendant "to benefit from the remedial provision of Colo.Rev.Stat. 4–3–311(C)(2) without violating Ohio Prof.Cond.R. 4.2."

{¶ 57} Plaintiff cites no authority establishing that tender of repayment to a represented party's counsel does not satisfy the statutory requirement that repayment must be tendered to "the person to whom the claim is asserted." Absent such authority, we cannot say that the trial court erred in concluding that

defendant successfully avoided an accord and satisfaction when it tendered repayment to plaintiff's counsel of record for the matters that the accord and satisfaction addressed. The trial court properly denied plaintiff's motion for summary judgment.

{¶ 58} The third assignment of error is overruled.

## VI. Disposition

{¶ 59} Accordingly, plaintiff's first and second assignments of error are sustained in part and overruled in part, and plaintiff's third assignment of error is overruled. The judgment of the Franklin County Court of Common Pleas is affirmed in part and reversed in part, and this matter is remanded for further proceedings in accordance with law and consistent with this decision.

Judgment affirmed in part
and reversed in part,
and cause remanded.

KLATT and FRENCH, JJ., concur.